TERM, 1859.]                    Brittin et al. vs. Handy.

## BRITTIN ET AL. VS HANDY.

The general principle is well established that equity prohibits a purchase by parties placed in a situation of trust or confidence with respect to the subject of the purchase—that no party can be permitted to purchase for his own benefit an interest where he has a duty to perform which is inconsistent with the character of purchaser; and this rule has been applied to purchases of outstanding titles and incumbrances by joint tenants; and in some instances by tenants in common.

But where a joint tenant or tenant in common purchases an outstanding title, which is adverse to the common title, his purchase is not void, but the co-tenant must elect within a reasonable time to avail himself of the benefit of the adverse title so purchased, and offer to contribute his due proportion of the money expended in purchasing the outstanding title.

B. sold to H. and C. a parcel of land, taking their joint and several note for the purchase money: the interest of C. was sold under execution at the suit of a third person, and afterwards purchased by B: the note being unpaid, and there being no property out of which B. could make the original purchase money, he brought suit, obtained judgment, caused the land to be sold under execution, and purchased it: *Held*, that B. did not purchase an outstanding title or incumbrance adverse to, or affecting the common title of his co-tenant and himself, but he purchased the several estate of his co-tenant; and that such purchase of his co-tenant's title was valid.

But if, in such case, B. induced H. to interpose no defence to the suit upon the note, to take no steps to delay the sale of the land, and to permit it to be purchased under execution at a nominal price, upon a parol agreement that the interest of H. in the land should remain unimpaired by the sale, and that B should hold it for the joint benefit of himself and H., such agreement, if proved, would bring the case within the principle settled in *Trapnall vs. Brown*, 19 *Ark*. 39; and B. would be regarded in equity as purchasing in trust for the benefit of H. etc.

But the allegations of the bill charging such parol agreement being positively denied by the answer, and there being no witness to the agreement, and no proof thereof, except vague declarations made by B. after he purchased the land, testified to by witnesses, after the lapse of a number of years after they were made, such proof is not sufficient to overturn the denial of the answer as to the existence of such agreement.

The rule in reference to judicial sales, is that, in the absence of all fraud and unfairness, mere inadequacy of price, however gross, does not invalidate the sale. But inadequacy of price would be regarded as a corroborating circumstance to sus-

tain the allegation in the bill of such parol agreement in reference to the sale, where such allegation was denied by the answer and proved by but one witness, and with other corroborating circumstances—stated in the opinion—would be sufficient to cause the oath of the witness to countervail the denials of the answer.

*Appeal from Hempstead Circuit Court in Chancery.*

Hon. ABNER A. STITH, Circuit Judge.

WATKINS & GALLAGHER, for the appellants.

The first objection we take to the decree of the court is, that even admitting the relief prayed for by complainant to be well founded in equity, yet the court, by rendering a decree in favor of the complainant, for the whole of the land in controversy, erred most egregiously. The bill itself merely alleged that the complainant was entitled to an undivided interest with defendant, Brittin, in the land in controversy, after deducting the amount due for the purchase money unpaid therefor, yet the court awarded the whole land in controversy to complainant.

It will be needless for us to do more than refer to the case of *Maulding vs. Scott et al., Ark. R.* 89, where it is decided that "nothing is evidence but what tends to prove some material fact in issue," and that a decree must be founded on, and sustained by both the allegations and proof in a cause, and that it cannot be based upon a fact not put in issue by the pleadings, so that at all events, no matter what may be the decision of this court, we consider that it admits not of controversy, that the decision of the court below, in awarding the whole of said land to complainant instead of declaring him a tenant in common with defendant, Andrews, is clearly erroneous, and must on this point be reversed.

But this we look upon as a mere trivial matter, so far as the final result of this cause is concerned, because we think that beyond a doubt, the complainant, in no manner, presents to the consideration of the court, a state of facts, that will in any manner entitle him to any such relief as is prayed for by him, in his bill of complaint, or to any relief whatsoever.

In 1838, Brittin sold the land to Handy and Conway, and made them an absolute deed, taking, at the time, their note for the purchase money, $500, with interest.

In 1840, Field bought out Handy for $1,250, for which he gave his note, and at Handy's request, paid Brittin $225 on the original note, which he held.

In 1843, Conway's interest in the land was sold under execution against him, and bought by and conveyed to John W. Cocke.

In 1844, Field having paid Handy about $600, got him to rue the bargain made in 1840, and Handy's interest in the original purchase reverted to him.

In 1845, Cocke sold and conveyed to Brittin the interest of Conway in the land, which had been sold under execution against him.

In 1846, Brittin obtained judgment against Handy for the amount due on the note of Handy and Conway, for the original purchase money of the land in controversy.

In 1847, the land was sold under execution of that judgment, and bought by Andrews—the same for all the purposes of this suit, as if it had been bought by Brittin.

Now, under the state of case presented, and upon the deeds, all duly executed, acknowledged, and placed on record, Brittin's right to this land is clear and unquestionable.

The allegations of the bill—all the essential allegations—upon which the controversy hinges, are positively and specifically contradicted by the sworn answers of both defendants, respecting matters alleged to be, or of necessity, resting within their personal knowledge. It will suffice to refer the court to the case of *Jordan adm. vs. Fenno*, 13 *Ark.* 596, or the more recent case of *Williams vs. Cheatham*, to show what effect such answers are to have. They are so far evidence for the defendants, that the complainant cannot prevail against them, unless they are overthrown by two witnesses, or one witness, and corroborating circumstances.

Now it is a fact shown by the evidence, that in 1846, Brittin

caused suit to be instituted on the original note of Handy and Conway, and recovered judgment; and it does not appear that Handy made any defence to the suit. As to that, it does not appear, nor is it pretended, that he had any defence to make. Equally true, so far as shown by the evidence, that he did not avail himself of the benefit of the appraisement law, [we shall not stop to enquire whether he had the privilege of a stay law,] but suffered the property to be sold, and it was purchased by Andrews, for the sum of five dollars. It does not appear that he attended the sale, or concerned himself about it in any way. But it does not appear, nor does he allege, that he was able or willing to have paid the debt due to Brittin, by bidding any more for the property, or that any body else would have done so. The essential feature is wanting—that other persons were deterred from bidding at the sale, in consequence of the supposed agreement or any agreement between Handy and Brittin, or his agent, Andrews. If that were so, it would not only afford, in itself, some evidence of the existence of an agreement of some sort, but would be obnoxious as a fraud upon the policy of the law in upholding the fairness of judicial sales—albeit, such an objection for fraud, wherein the debtor must, of course, have participated, should come from his other creditors, rather than from himself.

We repeat, for aught that appears, the sale was a fair one, and fairly conducted. Surely we need not cite authorities to show that mere inadequacy of price is not sufficient to avoid a sale, although it is sometimes available, in connection with other circumstances, to sustain the allegation of fraud. That is the most of it, that is said in *Byers vs. Surget,* 19 *Howard* 303, where it cut an important figure. And here, again, much depends on the attitude of the parties, and the nature of the case. At the suit of a creditor, or third person interested, an adequate consideration recited, and a lesser one actually paid, is a significant badge of fraud. But, as between these parties, if there was an agreement for Andrews to buy in the property, what did it matter, whether he bid five dollars or five hundred? If

there was no agreement, the open undisguised smallness of the consideration amounts to nothing in the way of vitiating the sale. But, say the counsel, it is evidence of the agreement. We ask, what agreement? We have not come to one yet, and we confidently maintain that the evidence no where discloses any. The counsel for complainant, after freely confessing that the allegations in the bill are not proved by what he terms direct and positive evidence, proceeds to build up a fabric of suppositions. It is enough, to dispose of this matter of inadequacy, to assume, for the present at least, that while it might come in aid of other evidence, it is not, of itself, evidence of an agreement not otherwise proven.

But it is for the complainant, (and it is the essence of his case, without which the jurisdiction and power of this court to enforce a parol contract as an exception to the statute of frauds, will not be called·into action,) to show that there was some certain or definite agreement made as alleged previous to the sale under execution, and that complainant acted as he did, in consequence of that agreement, so that a resulting trust has sprung up, for the reason, that it would be a fraud for the defendant now to refuse to carry out the agreement. The agreement must have been made before the sale; because, if made afterwards, there would be no consideration to uphold it. Confessedly, any such agreement rests in parol.

We submit that the record does not contain one particle of proof of the alleged agreement, or of any agreement, and all the imputations against the defendants are fictions. We must take the answers as true.

If, after Brittin's purchase of Conway's interest, and when he and Handy became tenants in common, he had acquired some outstanding title, it might be, that he would have to hold that title in trust for their common benefit. But how that doctrine can have any application to his purchase of Conway's interest, and which created the tenancy in common, is incomprehensible.

And equally incomprehensible how Brittin was to obtain

satisfaction of his judgment against Handy by a bill for partition.

GARLAND for the appellee.

The fact of Handy's making no defence to the suit—waiving the right of having the property appraised, and prevent its sacrifice—and the grossly inadequate consideration paid by Andrews for it, show conclusively that a fraud was practiced on him (Handy) and such a fraud as equity will relieve against. *Hill on Trustees* 152* *et sequens*; *Wright vs. Wilson*, 2 *Yerger*, 294; *Butler vs. Haskell*, 4 *Desaus.* 652; *Gest vs. Frazier*, 2 *Litt.* 118; *Barnett vs. Pratt*, 4 *Ired. Equity* 171; *Seymour vs. Delaney*, 4 *Johnson's Chancery Reps.* 222; *Heathcote vs. Paiquon*, 2 *Bro. C. C.* 175; *Underhill vs. Hawood*, 10 *Vesey* 219; *Ware vs. Herwood*, 14 *Vesey* 28; *Lester vs. Mahan*, 25 *Ala.* 445.

As Lord Hardwicke said, in *Gwinne vs. Heaton*, (1 *Bro. C. C.* 8), the consideration here is so grossly inadequate as to make one of sense wonder at it. Lord Eldon remarked, in *Gibson vs. Jeyes*, (6 *Vesey* 273), that this rule was loose enough, but it is one by which judges feel themselves bound, and to act upon for the safety of mankind.

Equity presumes a trust from the reasonable interpretation of the acts and conduct of parties. 2 *Story's Equity Jurisprudence, page* 628, *sec.* 1195. Equity will relieve against fraud by converting the person guilty of it into a trustee for those injured thereby. *Brown vs. Lynch*, 1 *Paige* 147.

A person obtaining a legal title by fraud, is considered in equity a trustee for the person from whom the same is acquired, and equity will compel a conveyance. *Perkins vs. Hays*, 1 *Cooke* 166. And where a person, by means of his promises, etc., gets the property of another, which turn out to be false and untrue, as well as injurious to the party giving up the same, equity will make the person obtaining it thus a trustee for the injured party. *Hill on Trustees* 151*; 6 *Watts & Sergeant* 97; 3 *Barr* 496; 6 *Barr* 428; 4 *Johnson's Chancery Reports* 118; 1

*Watts* 213.   And in such cases, the courts administer whole-some and stern justice.   *Hill on Trustees* 144\*.

Brittin's admissions and declaratiòns causing Handy to act in a certain manner, are conclusive on Brittin.   3 *Hill* (*N. Y.*) 215, *and authorities cited.*

The agreement between Brittin and Handy, although verbal, is not within the statutes of frauds.   *Digest of Ark., p.* 540, *sec.* 1; *Lockwood vs. Barnes,* 3 *Hill* (*N. Y.*) 128, *note a.*

Brittin sets up a deed from Cocke and wife to half interest in the land, which makes him tenant in common with Handy— one trustee for the other—and the whole proceeding to sell and purchase the land, as he did, was a gross fraud—he could not hold the title acquired from Cocke to his own use against Handy, nor could he possess himself of the whole of it as he did.   4 *Kent's Com.* 369, *and authorities cited; Id.* 371; *Percy vs. Millandon* 18 *Martin Louisiana Reports* 616; *Field vs. Pilot,* 1 *McMullen* (*S. C.*) *Reports* 370; *Van Horne vs. Finda,* 5 *Johnson's Chancery Reports* 407; *Bachelder vs. Fisher,* 17 *Massachusetts Reports* 464; 1 *Bal. & B.* 46; 9 *Paige* 297; 4 *Beavans* 487; 1 *Sandford's Chancery R.* 214; 8 *Wheaton* 421; 5 *J. C. R.* 497; 7 *J. C. R.* 174.

Such transactions are looked upon with odium and suspicion, and are void as interdicted by the policy of the law.   *Hill on Trustees* 159\*; *Moore vs. Royal,* 12 *Vesey* 372.   See particu-larly *Bank of Utica vs. Mercercan et al.,* 3 *Barber Ch. Rep.* 528; *Adams' Eq.* (*2d Am. Ed.*) 181 (61\*), *with the whole doc-trine.*

We think the very fact of his buying property, to which he was already partially entitled, is sufficient to vitiate the whole transaction.   See particularly *Adams' Eq.,* (*2d Am. Ed.*), *notes by Ludlow & Collins, page* 181 (61\*), *note* 1 *citing great many authorities.*

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

BILL for partition, etc., filed 9th October, 1852, in the Hemp-

stead Circuit Court, by Levin J. Handy, against Benj. L. Brittin and Wm. W. Andrews.

The bill alleges that on the 28th April, 1838, the complainant and Wm. Conway B. purchased of Brittin that portion of the south-east quarter of the south-east quarter of section 21, township 11, south of range 25 west, which lies on the south-east side of the public road leading from Washington to Fulton, in Hempstead county, containing from four and a half to five acres; for which they agreed to pay him $500, and executed their joint note to him for that sum, payable in five years, with six per cent. interest; and on the same day he made them a deed to the land.   Immediately after their purchase they took possession of the land, which was unimproved, and erected a dwelling and other improvements thereon, at an expense of some $1,250, which improvements, with but few exceptions of little value, remain upon the land.

On the 22d June, 1843, complainant paid on the note given for the purchase money, $125; and, shortly afterwards, he made a further payment of $100; the aggregate of the two sums being within $25 of one half of the amount of the note; while *Conway B.* had never paid a cent upon the debt.

That in the summer of 1846, Brittin went to New York, and was absent about twelve months.   Previous to his departure, he complained to complainant, as he had often done before, that Conway B. had paid nothing on said joint note, and observed that he would have to sue on the note, in order to secure himself against Conway B.; expressing regret that inasmuch as the note was a joint one, he could not sue Conway B. alone, but would have to join complainant with him; but assured complainant that inasmuch as he had paid almost the whole of his proportion of the note, his interest in the property should remain unimpaired by the suit, and should be retained and enjoyed by him as fully and to the same extent, as if the suit had never been instituted; Brittin saying, at the same time, that his whole object in the suit was to drive Conway B. into a settlement, who was largely indebted to him, independently

of the joint note, and he wished to get the property into his own hands, so as to control the interest of Conway B. therein. That after these assurances, that complainant's interest in the premises—which he avers to be an undivided moiety—should remain unprejudiced by the suit, Brittin further agreed with him that if the suit was brought, he would pay complainant's portion of the costs, and that he need be at no expense or trouble in the matter—declaring, at the same time, that he was very doubtful of Conway B., on account of his indebtedness to him in other matters, besides the joint note, but that it was no part of his intention, by the suit or any of its consequences, to to make complainant's interest in the premises liable for the payment of any part of the indebtedness of Conway B.—meaning thereby that he did not intend to hold complainant, or his interest in the land, liable for more than one half of the joint note.

That in consideration of these assurances, complainant agreed to take no dilatory steps to delay the progress of the suit, but to let judgment go by default, and allow the property to be sold as soon as the law would admit; and not to avail himself of the benefit of the appraisement act; and that Brittin should be allowed to bid in the property, and hold it under the agreement aforesaid.

That Brittin, shortly after, went to New York, leaving Andrews, his ostensible clerk, and agent, in charge of his business, who, pursuant to his directions, instituted suit on the note, 20th September, 1846, in the Hempstead Circuit Court. That Andrews requested complainant to let judgment go by default; and that if Conway B. did not settle before the property was exposed to sale, to allow him Andrews, to bid it in for Brittin, assuring complainant that Brittin's only object was to secure himself against the indebtedness of Conway B. upon the note; and that complainant might feel entirely safe in entrusting the property to the control of Brittin; who would take no undue advantage of him, but that his interest in the property, should

remain between Brittin and him, as it had existed between him and Conway B.

That complainant, relying upon these additional assurances of Andrews, as the clerk, etc., of Brittin, interposed no defence to the suit; and that judgment by default was obtained therein, 6th November, 1846, for $500 debt, and $140 41 damages, etc., execution issued 7th January, 1847, was levied on the land in question, which was offered for sale the 15th February following, and bid off by Andrews as the agent of Brittin, for $5, pursuant to the agreement between Andrews and complainant, and between complainant and Brittin. [The judgment and execution are exhibited.]

That Brittin, after the sale and purchase by Andrews, declared, proposed and acknowledged to complainant, that after the payment of the joint debt due from complainant and Conway B. to Brittin, the premises should belong to and become the property of complainant; and that all he, Brittin, wanted was to make the debt out of the property; and that complainant should have the residue; and complainant avers that he has always been, and still is ready and willing to accept the property, and pay to Brittin the balance due upon the debt, after deducting the payments made by complainant, and the amounts received by Brittin from sales, and rent of the property.

That Brittin and Andrews, before and after the sale of the land under execution, were jointly interested in the profits of the mercantile business carried on in the name of Brittin; and in all purchases made with the capital stock, or by means of debts due the house, in the name of either of them.

That in the course of a few months after the sale of the land, Brittin returned from New York, and in speaking of the property, fully recognized complainant's interest therein, according to the understanding and agreement above set forth, and requested him to take charge of the renting and selling of the property—that they agreed that they would not sell the land for less than $150 per acre, and that they would rent or sell the dwelling house on the premises, as might seem to be most

advantageous. That in pursuance of this agreement, Brittin sent divers persons to complainant, who had in view the renting or purchasing of some portion of the property. That Brittin and complainant did sell the dwelling house with a quarter of an acre of the land on which it is situated for $450; and also other portions of the land, amounting to about an acre, for $212 50. That these sales were made upon consultation and with the consent of complainant.

That previous to the sale of the dwelling house, Brittin, in further pursuance and performance of the above agreement, paid to complainant one half the sums derived from the rent of the house, from the time Andrews purchased it under execution to the time Brittin and complainant sold it as aforesaid. That complainant's portion of the rent was credited upon a store account which he owed Brittin, etc., etc.

That Brittin, in still further performance of said agreement, wishing to purchase complainant's interest in the premises, offered him $50 in merchandize therefor, at divers times, which complainant declined to accept, well knowing that his interest in the property was worth much more, etc. That at the time Andrews purchased the property for $5, it was worth $1700 or $1800, and is still worth but little less; and that complainant's interest therein was one undivided half.

That when the joint note for $500 was executed, it was understood between the parties that complainant was to be responsible but for half of the amount; and, having paid Brittin $225, which was credited upon the note, he was indebted to Brittin but $25, balance of principal, when the judgment was obtained upon the note; which, with interest, was paid out of the proceeds of the sale of the house, etc. That, after deducting the amount of such indebtedness, complainant was entitled to one half of the remainder of the proceeds of the two sales of portions of the property, made by Brittin and himself, as above stated—the proceeds of the first sale being $450, and of the second $212 50.

That Andrews promised complainant to allow credits for the

$225, paid by him upon the note, before taking judgment, etc ; but, in violation of his promise, obtained judgment for the full amount of the note, etc.

That Andrews, after bidding off the property, as the agent of, and for Brittin, took the sheriff's deed therefor in his own name, and pretends to hold the property for his own use, though he professed to be acting for Brittin throughout the whole transaction, etc.

That there remain unsold of the original tract of land about three acres and a quarter, etc., worth from $200 to $250 per acre. "That the land is capable of being divided without material injury to the rights of either Brittin or complainant, claiming as complainant does, one undivided half of the tract— meaning the three acres and one quarter, above mentioned— in accordance with the understanding and agreement, as set forth above, between Brittin and complainant, previous to the institution of the suit upon the note, and carried out, acted upon and confirmed, by Brittin, after the judgment was obtained, and the property sold under the execution issued thereon."

Complainant further alleges "that he had frequently called upon Brittin to further comply with his said agreement with complainant, that his interest in said property should remain unimpaired and unprejudiced by said suit, and that complainant should have and retain, possess and enjoy the same in as full and ample a manner as if the suit had never been brought, and to pay over to complainant his proportional share of the said $450, for which the said house and said quarter of an acre of land was sold; also, his proportional share of the said $212 50 for which the other portions of the land, amounting to about an acre, were sold; and also to make an equal division with complainant of the remaining three and one quarter acres of the tract," etc , which he has refused to do, etc., etc.

The bill prays for an account of rents, proceeds, etc., and that one half of the amount thereof be decreed to complainant, after deducting therefrom the sum due to Brittin on that portion of the joint note for which complainant was liable; and that

the remaining 3 ¼ acres of land, be equally divided between Brittin and complainant, etc., etc.

That in case the relief above prayed be denied, that the court decree to complainant the whole of the land remaining unsold; and that Brittin account for and pay over to him, all sums of money received by him of complainant, and from the sales and rent of the property, over and above the amount of the debt due to Brittin from complainant, and Conway, B., etc., etc., and that Brittin & Andrews be compelled to convey the land to complainant, etc., etc.

Brittin & Andrews answered severally. *Brittin* admits that he sold the land to complainant and Conway B., took their joint and several note for the purchase money, gave them a deed, and that they entered upon the land and made valuable improvements; but denies that the land was unimproved when he sold it to them; and avers that there was a house, etc., upon it, which they took down, and removed, which rented for more than the one they erected, etc.

He admits that in the year 1853 complainant paid $225 upon the note, through John Field, to whom he sold his interest in the land, and afterwards took it back, etc., and that Conway B, had paid nothing upon the debt.

Admits that he left the State for the east, in September, 1846, and was absent until June following, and thinks it probable, though his recollection is not distinct, that previous to his departure he complained to Handy that Conway B had paid nothing upon the note. But he denies, that he ever, at any time, said that he would have to commence such suit merely for the purpose of securing himself against Conway B, or that he ever expressed to complainant regret at having to join him in the suit, or that he assigned any such reasons for joining him in the suit, as alleged in the bill; or that he, in any manner, assured complainant that his interest in the land should remain unimpaired or unprejudiced by the suit, or that he agreed or said any thing to the effect, that complainant should retain, enjoy or possess his interest in the property to the same extent

as if said suit had never been commenced; or that he ever said that his only object in bringing suit was to get control of Conway B's interest in the land, or anything to that effect; or that he ever agreed that he would pay complainant's part of the cost, if suit was brought; or that he ever said any thing to the effect that it was not his intention, by the suit or its consequences, to make complainant's interest in the land liable for the debt; or that he ever said that he did not intend to hold complainant, or his interest, liable for more than one half of the debt, or that he said or did any thing calculated to induce such impression, etc.

He further positively denies that there was any such agreement or understanding between him and complainant, in relation to said suit, proceedings therein, judgment, execution, or sale thereunder, as alleged in the bill.

*Brittin* further answers that two judgments were obtained against Conway B, in Pulaski Circuit Court, in November, 1842, executions were issued thereon to the sheriff of Hempstead county, levied on Conway B's interest in the land in question, and returned without sale. That afterwards *Vend. Ex.s.* were issued, his interest in the land sold, and purchased by John W. Cocke, on the 27th November, 1845, who obtained the sheriff's deed therefor. That on the 2d of January, 1846, respondent bought of Cocke the interest in the land so purchased by him, and received his deed therefor, whereby he became the absolute owner of Conway B's interest in the land; which was well known to complainant before respondent left for the east, in September, 1846; and which respondent avers to be sufficient to refute the charge in the bill, that he assured complainant that his only object in instituting and prosecuting the said suit, was to obtain the interest of Conway B, in the land.

He further answers that he was well aware that Conway B and complainant were jointly and severally liable to him upon the note; but from the fact that, as between them, Conway B should have paid half of it, respondent would have put himself to the trouble to collect it of him, as a favor to complainant, if

it had been possible to do so; but he had become satisfied some-time before the suit was brought, that his only chance to collect the debt from either of them, was by a sale of the land; and he positively denies that he only looked to or held complainant, or his interest in the land, liable for the payment of one half of the debt.

That when he departed for the east, he left his books, accounts, notes, etc., and among them the note of complainant and Conway B, in the hands of Andrews, his clerk and agent, empowering him to manage his business, collect the claims, etc., without any special instructions as to said note, leaving him to take such steps in relation to it, as well as other claims, as he thought proper.

He admits that Andrews caused suit to be brought on the note, that judgment was obtained, execution issued, the land levied upon and sold, purchased by Andrews and conveyed to him by the sheriff; but he denies that these proceedings were had under, or in pursuance of any such conversation, agreement, or understanding between complainant and Andrews, in relation to the recovery of the judgment, or the sale of the land as that alleged in the bill.

He admits that he returned from the east shortly after the sale of the land; but he denies that he did, at any time thereafter, in any manner, either as charged in the bill, or otherwise, recognize or admit the right or title of complainant to any part of the land. But in answer to the charges in the bill in that behalf, respondent says that it has been almost an invariable practice with him, when he bought property under execution in collecting a debt, to permit the debtor to redeem within a reasonable time by paying the debt. That as his only object in having the land in question sold, was to secure or make the debt due from Conway B and complainant, and not desiring to speculate upon the necessities of any one, after his return from the east, he told complainant if he and Conway B would pay the amount due from them to him within any reasonable time, he was willing to let them have the property; or that if com-

plainant could, within a reasonable time, make any sale or disposition of the land so as to pay the debt, he might do so, and could have the benefit of all he could realize above the amount due to respondent. And as complainant was always complaining and asserting that the property was worth much more than the amount due to respondent, for sometime after his return, and after he had told complainant that he might redeem, when persons would call upon him to rent or purchase the land, he would refer them to complainant, being willing that he should have the benefit of any sale he could make—not that he had any right, but merely as a matter of grace and favor, etc.

Respondent denies that he ever requested complainant to take charge of the renting or selling of the land; or that they made any agreement in regard to the price at, or manner in which they would sell, or rent the property, or any part of it; or that he sent any person to complainant, having in view the renting or purchasing of any part of the land, to consult with him respecting the terms, in pursuance, or under, or by virtue of any agreement to the effect that complainant's interest in the land was not to be impaired or affected by said sale thereof under execution, etc.

If complainant had made any arrangement by which the amount due to respondent would have been paid even within a year from the time Andrews purchased the land under execution, respondent would have let him have the property; but it could not have been asked or expected that he should have left his gratuitous proposal open for a longer period than he did.

Respondent admits that he has sold the dwelling house, with a quarter of an acre of land, upon which it stands, for $450; and that he has also sold about an acre more for $212 50; but he denies that complainant had any connection with any of said sales, or any interest therein; or that he was consulted in relation thereto, or that any of said sales were made with or by his consent, as charged in the bill, or that he is entitled to any part of the money arising from such sales.

He denies that he ever accounted to complainant for any part of the rents of the property accruing after the sale of his interest under execution; or that he ever in any manner recognized or admitted his right to any such rents, or that he ever credited his account therewith.

He states that since complainant's interest in the land was sold under execution, and since it has greatly appreciated in value, respondent has been much annoyed by the importunity of complainant, who was in the habit of complaining of his misfortunes, and the hardship of the case; and insisting that respondent should only hold him liable for one half of said note, and that upon his paying that, he should have one half of the land; and upon such occasions respondent has given him articles out of his store, such as clothing, etc., but he particularly denies that he has, in any manner, recognized or admitted complainant's right to any part of said land, or the rents accrued since said sale under execution, or in any manner accounted to or credited complainant with such rents.

He admits that a short time before the filing of the bill in this case, and after complainant had threatened to sue, respondent observed to him that though he had not a shadow of claim to any part of the property, yet if he brought suit it would cost respondent $50 to employ a lawyer to defend it, and that he would rather give that sum to complainant than to a lawyer; and respondent did propose to give him $50 in merchandize for his pretended interest in the property; but the offer was made merely by way of compromise, to avoid a law suit, and was not intended as a recognition of any right in complainant, as was distinctly stated at the time, etc.

Denies that the land was worth any thing near the sum stated in the bill at the time it was purchased by Andrews: and avers that until recently he would gladly have taken the amount due him, and relinquished the whole of the land; but in consequence of the improvement of the portions sold by respondent, and the general improvement in that part of the town of Washington in which the land is situated, its value has appreciated so that

the part still owned by the respondent and Andrews, is worth about $300.

Admits that Andrews purchased the land in his own name, etc., etc., but so far as any pretended right of complainant thereto is concerned, it stands as though the sheriff's deed had been taken to respondent, etc.

States that the note of complainant and Conway B., with the payments made by the former endorsed thereon, was filed at the time judgment was taken, but the Clerk of the Court, in making a computation of the amount due, and in entering the judgment, omitted part of the credits by mistake, etc., but respondent claimed no advantage of such mistake, and is willing to allow credit for the full amount of the payments, etc.

Further answers that after he purchased the interest of Conway B., and before the sale to Andrews, the property was rented by complainant and respondent jointly; and that after the purchase by Andrews, one half of the rents that accrued before said purchase, and whilst the land was held jointly by complainant and respondent, was credited and accounted for to complainant, etc., etc.

*Andrews* states in his answer, that when Brittin was about to start east, he placed in his hands his notes, accounts, etc., to be managed by him as his clerk and confidential agent, and that among said notes was the note of Conway B. and complainant; but he denies that, as regards said note, Brittin gave him any special instructions whatever, but, on the contrary, merely left the same, as all other papers, to be managed as to him should seem best. That the note being long due, and knowing that the only chance to make the money due thereon was by sale of said land, he caused said suit to be instituted, judgment to be obtained, execution to be issued, and the land to be sold; but he denies positively that he caused the suit to be instituted under any special instruction from Brittin; or that he did, as the clerk and agent of Brittin, or otherwise, request complainant to let judgment go by default, or request him not to retard a judgment, or delay a sale of the property, or that

he made any agreement with the complainant of the purport or to the effect stated in the bill, or that he ever said, or assured complainant, that his interest in the land was not intended to be, or would not be affected by said suit, or sale, or that he said or did any thing calculated to induce complainant to be- lieve that the only object of the suit and sale was to reach Conway B., and avers every charge, averment, or insinuation in the bill, as to all such matters, to be untrue, etc.

He also avers that complainant, long before, knew that Brit- tin had purchased Conway B.'s interest in the land, etc.

As to other matters, he answers, in effect, the same as Brittin.

The cause was heard upon the bill, answers, exhibits, replications, and the depositions of *John Field*, *Henry J. Kimbell*, *Charles B. Mitchell* and *Eli. V. Collins*, and the Court decreed:

That Brittin account for all the rents of the land received by him, not before accounted for, together with the proceeds of the sale of any portion of the tract, by him received, with interest from the receipt thereof; and that the same be applied in dis- charge of the residue of the purchase money and interest unpaid and due to him from complainant and Conway B.; and that complainant pay to Brittin the residue of the purchase money of the land, and interest yet unpaid; together with $30, in the deed from Cocke to Brittin specified, with interest from the date of said deed; and that an account be taken of the matters herein, computing interest to the time of the statement thereof.

That Brittin and Andrews be enjoined from setting up any title to the land, etc.

That if complainant did not pay to Brittin any balance of purchase money, etc., etc., found to be due him, within thirty days from the confirmation of the master's report, the remainder of the land should be sold for the satisfaction thereof, etc., etc.

Brittin and Andrews appealed from the decree, etc.

1. On the supposition that the appellee, Handy, was entitled to the whole of the land, as decreed by the Court below, there

400   CASES IN THE SUPREME COURT

Brittin et al. vs. Handy.   | MAY

was no necessity of referring the case to the Master to ascertain what balance of purchase money was due to Brittin; for, saying nothing of rents, it is manifest that the $225 paid by Handy about June, 1843, and the $662 50 received by Brittin from sales of portions of the land, overpaid the whole of the purchase money and interest, it appearing from the depositions that none of the sales were made later than the close. of the year 1848.

But the Court manifestly erred in decreeing to Handy the whole of the land upon the pleadings and proof in the cause. By the conveyance from Brittin to Handy and Conway B., of September 28th, 1838, they became joint and equal owners of the land. By the technical definitions of the common law, they were joint tenants.

It appears from the exhibits to the answer of Brittin, that Conway B.'s undivided half of the land was purchased by Cocke, under executions, 19th November, 1845, and that he and wife conveyed it to Brittin, January 2d, 1846.

The bill makes no allegations attacking the regularity or validity of these sales and conveyances: indeed they are not mentioned in the bill at all.

The counsel for appellee submit that Brittin committed a fraud upon him in concealing from him his purchase of Conway B.'s interest in the land, etc.

But there is no allegation in the bill, or proof, of any such concealment. On the contrary, although it may be possible that appellee was ignorant of the fact that Brittin had purchased the interest of Conway B. in the land, even down to the time the bill was filed, yet the sources of information were ample and open to him, and the legal presumption would be that he was informed of the fact. The sale of Conway B.'s half of the land to Cocke under executions, took place, it appears, at the court-house door in the county in which Handy resided, and on the public day fixed by law for the sale of the land. The deed of the sheriff to Cocke was acknowledged in open Court, and filed in the Recorder's office for registration

and duly recorded.  There is, therefore, no ground for the assertion that Brittin concealed from the appellee his purchase of the interest of Conway B. in the land, for if concealment was his purpose, the putting of his title upon the public records was not a sensible mode of accomplishing it.

The counsel for appellee further insist that Brittin and Handy, being tenants in common, the former purchased the interest of Conway B. in the land for the benefit of the latter (Handy) as well as himself.  In other words, that he purchased as a trustee for the benefit of his co-tenant and himself.

It need only be remarked, in response to this position, that until Brittin purchased the undivided half of Conway B., he had no interest in the land at all (except perhaps an equitable *lien* for the unpaid purchase money); and that it was by virtue of that purchase that he became a tenant in common with Handy—then, and not before, the relation of tenant in common commenced between them.

There is no ground upon which the decree of the Court below, giving Handy the whole of the land, can be maintained, upon the pleadings and proof in the cause, as above indicated.

2. It is next insisted by the counsel for appellee, that Brittin, occupying to Handy the trust relation supposed to exist between tenants in common, could not purchase the interest of Handy in the land under execution; and that his purchase (through Andrews, his agent,) was inequitable, fraudulent and void. That Brittin after obtaining judgment for the purchase money remaining unpaid, should have filed a bill for partition against Handy, and subjected his interest in the land to the satisfaction of the judgment, after adjustment of accounts, etc.  In other words, the proposition is maintained that one tenant in common cannot purchase the interest of his co-tenant in the land under execution.

The authorities cited by counsel do not sustain this proposition.

The general principle is well established, that equity prohibits a purchase by parties placed in a situation of trust or confi-

dence with respect to the subject of the purchase—that no party can be permitted to purchase, for his own benefit, an interest, where he has a duty to perform which is inconsistent with the character of purchaser. *Dickinson et al. vs. Codwise et al.*, 1 *Sandf. Ch. R.* 226.

And this rule has been applied to purchases of outstanding titles and incumbrances by joint tenants; and, in some instances, by tenants in common. 1 *Lomax Dig.* 262; *Van Horne vs. Fonda*, 5 *John. Ch.* 388; *Flagg vs. Mann*, 2 *Sumner* 490; *Venable et al. vs. Beauchamp*, 3 *Dana* 332.

In *Van Horne vs. Fonda*, Chancellor KENT said: " I will not say, however, that one tenant in common may not, in any case, purchase an outstanding title for his own benefit exclusively. But when two devisees are in possession, under an imperfect title, derived from their common ancestor, there would seem naturally and equitably to arise an obligation between them resulting from their joint claim and community of interest, that one of them should not affect the claim to the prejudice of the other. It is like an expense laid out upon a common subject, by one of the owners, in which case all are entitled to the common benefit, on bearing a due proportion of the expense. It is not consistent with good faith, nor with the duty which the connection of the parties as claimants in common of the subject created, that one of them should be able, without the consent of the other, to buy in an outstanding title, and appropriate the whole subject to himself, and thus undermine and oust his companion. It would be repugnant to a sense of refined and accurate justice. It would be immoral, because it would be against the reciprocal obligation, to do nothing to the prejudice of each other's equal claim, which the relationship between the parties as joint devisees created. Community of interest creates a community of duty, and there is no real difference, on the ground of policy and justice, whether one co-tenant buys up an outstanding incumbrance, or an adverse title, to disseize and expel his co-tenant. It cannot be tolerated when applied to a common subject in which the parties had equal concern, and which created a mutual obligation to deal candidly

and benevolently with each other, and to cause no harm to their joint interest."

In *Flagg vs. Mann*, Judge STORY, after quoting with approbation the above remarks of Chancellor KENT, says:

" In the present case, the community of interest (if any) arose from direct contract between the parties: and from a direct agreement, not rescinded or abandoned, to purchase the original, as well as the outstanding, title upon joint account. In such a case, there would seem to be no room for doubt, that if the parties stood in the relation of co-tenants, or joint owners, a court of equity ought to deem the purchase of an outstanding incumbrance or adverse title by one to be a trust for the benefit of both, if not *ex contractu*, at all events *in foro conscientiæ*."

Mr. LOMAX, after quoting also the above remarks of Chancellor KENT, says: " It is, therefore, considered that joint tenants and coparceners stand in such confidential relations in regard to one another's interest, that one of them is not permitted in equity to acquire an interest in the property hostile to that of the other. And, therefore, a purchase by one joint tenant or coparcener of an *incumbrance* on the *joint estate*, or an *outstanding title to it*, is held at the *election of his co-tenants*, within *a reasonable time*, to enure to the equal benefit of all the tenants, upon condition that they will *contribute* their *respective ratios* of the *consideration* actually given.

" The same equity is considered as subsisting between *tenants in common under the same instrument*. But it is suggested that tenants in common, probably, are subject to this mutual obligation only where their interest occurs under the *same instrument*, or *act of the parties*, or *of the law*, or where they have entered into some engagement or understanding *with one another*, for persons acquiring unconnected *interests* in the *same subject by distinct purchases*, though it may be under the same title, are probably not bound to any greater protection of one another's interests, than *would be required between strangers*."

It may be remarked that in the case now before us, Brittin

did not purchase an outstanding title or incumbrance, adverse to or affecting the common title of his co-tenant and himself, but he purchased the several estate of his co-tenant in the land under execution, etc.

It may be further remarked that Brittin and Handy were not tenants in common under the same instrument, etc., but that they purchased at different times, and held by different titles, though both of their titles were derived from the same source.

It may be further observed that where a joint tenant, or tenant in common, purchases an outstanding title, which is adverse to the common title, his purchase is not void, but the co-tenant must elect within a reasonable time to avail himself of the benefit of the adverse title, so purchased, and offer to contribute his due proportion of the money expended in purchasing the outstanding title.

In the case before us the bill does not disclose the fact that the relation of tenants in common existed between Brittin and Handy. All that we know of the purchase of Conway B.'s undivided half of the land by Brittin, and of his thereby becoming a tenant in common with Handy, we learn from the answers and exhibits.

Considering the bill and answers, etc., together, and the case made is, that after Brittin had purchased Conway B.'s interest in the land, there remained a balance due to him upon the note executed to him by Conway B. and Handy, upon which they were severally, as well as jointly liable, and for the payment of which Brittin had, perhaps, in equity a vendor's lien upon the land. There being no property out of which he could secure his debt but the land, he brought suit upon the note, obtained judgment, caused the land to be sold under execution, and his agent purchased it.

Under these circumstances, in the absence of any positive rule of law forbidding it, we think his purchase of his co-tenant's title to the land was valid.

3. It remains to consider the only point really made by the gravamen of the bill.

It is alleged in the bill, in substance, that Brittin & Andrews induced Handy to interpose no defence to the suit upon the note, to take no steps to delay the sale of the land, and to permit it to be purchased under execution at a nominal price, upon a parol agreement that Handy's interest in the land should remain unimpaired, by the sale, and that Brittin should hold it for the joint benefit of himself and Handy.

If these allegations had been proven substantially, as alleged, the case would have been within the principles settled in *Trapnall vs. Brown*, 19 *Ark.* 39; and Brittin would have been regarded, in equity, as purchasing in trust for the benefit of Handy, etc.

We have shown in the statement of the pleadings above, that Brittin and Andrews deny in the most direct and positive manner that any such assurances were given, or agreement made as alleged in the bill.

If the allegations of the bill are true, and the denials of the answers false, it is the misfortune of Handy that he had no witness to swear to the truth of the one and the falsity of the other.

The substance of such portions of the depositions read upon the hearing, as are deemed material to the issue, is as follows:

JOHN FIELD testified that in January, 1848, he purchased of Eli V. Collins, a piece of ground which he (Collins) had previously purchased of Brittin—supposed to be half an acre—upon which Collins was erecting a house, etc. Witness moved into the house in the spring of 1848, and remained there until he sold it to Mrs. Johnson, etc. Sometime after he moved into the house, he applied to Brittin to purchase a strip of ground adjoining that portion he had sold to Collins. The strip of ground witness wanted belonged to what was then called the Conway and Handy tract, and from which the piece purchased by Collins had been carved.

Witness had no conversation with Andrews or Handy on the subject. Brittin told witness he could have the piece of ground at $150 per acre. Witness had several conversations with

Brittin in relation thereto.   Witness insisted on getting the small strip of ground for less than $150 per acre.   As well as witness can recollect, he understood from Brittin, in some of their conversations, that he had promised or agreed with Handy to sell the ground at $150 per acre.   Such was witness' recollection; he might be mistaken, but did not think he was.   He acted under that impression at any rate, and accordingly went to Brittin again and closed the trade for the strip of ground; Doctor Mitchell being present.   About 30-100 of an acre in the strip.   Witness did not take a deed from Brittin at the time. Some time afterwards he sold the pieces of ground, purchased by him from Collins and Brittin, to Mrs. Johnson, and as the title to both pieces was in Brittin, and perhaps in Andrews, witness got them to make the deed to her.

HENRY J. KIMBELL deposed that he had a conversation with Brittin in regard to the purchase of the land; Brittin said it was the Conway and Handy tract.   A part of the same tract was sold to Collins, and a part to *Cimminati*, situated in the town of Washington.   Brittin stated to witness what he could have it for by the acre, but he did not recollect the price. Brittin said it had been sold under his execution against Conway B, and Handy consented that it should all be sold together. This was about the time *Cimminati* bought of Brittin.   He did not say whether Handy had, or had not, any interest in the land at that time.

CHARLES B. MITCHELL deposed that he was present when John Field traded with Brittin for the strip of land on the east side of the tract purchased by Field of Collins, for which he agreed to give Brittin at the rate of $150 per acre, which was the price then fixed upon said land by Brittin.   He said he would take no less for it.   This was about the year 1848.

ELI V. COLLINS deposed that he once purchased of Brittin, a tract of land situated in the town of Washington, which he afterwards sold to Field.   At the time witness made the purchase, Brittin referred him to Handy as to the price of the land, and to ascertain whether Handy would agree to the price.

Brittin stated the price to be at the rate of $150 an acre, and referred to Handy to know whether he would be willing to take the $150 per acre for the land.   Brittin did not say at the time what interest Handy had in the land; but he said Handy had a *say-so* in the price of the land; but that the proceeds were to go to him, Brittin.   Witness spoke to Handy and told him what Brittin had agreed to take for the land, and he consented to the sale, and agreed to the price, and witness made the purchase.   Did not recollect how much land he purchased, but the deed made by Brittin would show.

It was his understanding that the land, so purchased by him, was a part of the Handy and Conway B tract, so called. There was a house on the tract, erected by them, he supposed. Conway B lived in the house at first.   It could not have been built at that time for less than six hundred dollars, he judged. He rented the house of Brittin, for a time, and paid the rent to him.   In making the contract for the rent of the house, Brittin referred him to Handy for the price.   Brittin told witness he could have it for $4 50 per month, as he recollects, if Handy agreed to it, and he afterwards saw Handy, and Handy agreed to the price.   Did not recollect that Brittin said Handy was to have the rent.   Thinks Brittin said at the time, that Handy was owing him, that he had paid money for him, and he was to have the proceeds of the land.

*On cross-examination* by the counsel for Brittin, etc., he stated that the purchase of the land by him from Brittin was in the year 1846, as near as he could recollect, but he was not sure about it.   The year in which he rented the house, spoken of on his examination in chief, of Brittin, was 1845.   He thinks he rented it in the fall of 1846, and stayed there until the spring of 1847, as near as he could recollect.   The house, at the time he rented it, was not worth as much as at first.   Brittin sold it to Cimminati for $450, which was as much as it was worth.

The above depositions were taken in January and February, 1855.

The above declarations of Brittin to the witnesses, testified

to after the lapse of six or seven years from the time they were made, together with the inadequacy of the price at which Andrews bid off the land at the execution sale, are the only facts adduced by Handy to overturn the solemn denials of the answers in relation to the agreement, etc., alleged in the bill as the grounds of relief. If such an agreement was in fact made, this case aptly illustrates the importance of reducing such agreements to writing, or of making them in the presence of witnesses. COLLINS' recollection seemed to be that it was in the year 1846 that Brittin referred him to Handy about the price of the land, etc., etc.

Brittin purchased Conway B's interest in the land of Cocke 2d January, 1846, and Handy's half under execution 15th February, 1847. From the time of the first to the date of the second purchase, Brittin and Handy were joint owners of the land, it was proper that Handy should be consulted in relation to both the rent and sale of the land during that period, and it may have been during that time that Brittin referred the witness, Collins, to Handy in relation to the price, etc.

But if Brittin referred him to Handy in regard to the price of the land after the execution sale, this was not inconsistent with the statement in his answer, that after he became the owner of the whole of the land, he, as a matter of favor to Handy, told him that if he could redeem the land, or make sale of it so as to pay his debt within a reasonable time, he could have the privilege of doing so.

The same may be said in relation to the statement of Brittin to Field, that he had promised Handy not to sell the land for less than $150 per acre.

It appears that under the execution in favor of Brittin, the sheriff levied on the land as the property of the defendants therein—and that Andrews bid off the interest of Conway B for $5, and the interest of Handy for a like sum. The interest of Conway B having been previously sold under executions, and purchased by Cocke, and by him conveyed to Brittin, the sum bid by Andrews for it cannot be regarded as inadequate.

But it is manifest that the amount for which Handy's interest in the land was struck off to Andrews was greatly below its value. The sale, however, was a judicial one, made at the time and place prescribed by law, upon due notice, and there is no proof that any means were used, by any person, to prevent competition.

We understand the rule to be, in reference to judicial sales, that in the absence of all fraud and unfairness, mere inadequacy of price, however gross, does not invalidate the sale.

If, however, the promises and agreements alleged in the bill, had been proven by the oath of one witness, we should certainly regard the inadequacy of price, together with some of the declarations of Brittin subsequent to the sale, which are not satisfactorily accounted for, as such strong corroborating circumstances as would cause the oath of such witness to countervail the denials of the answers. But the witness is wanting.

The decree of the Court below is reversed, and the cause remanded with instructions to dismiss the b ill, etc.