Judge Ewing

delivered the Opinion of the Court.
Masterson and Miller, claiming by deed of conveyance, under William Phillips, brought an action of ejectment against the tenant of one Perciful, and recovered judgment for the lower half of Phillips’ pre-emption.
The Thrustons and others, claiming to be in possession of the land recovered, filed their bill, setting up superior equity, under the following entry and junior patent thereon: to wit. “May 22d, 1780, Charles Minn Thruston enters eight thousand acres upon Treasury warrants, on Woolper’s creek, about eight miles below the Big Miami, to begin about a mile and a half from the mouth of the creek, and to run up on both sides for quantity;” and injoined the judgment, making Masterson and Miller and the unknown heirs of Phillips parties; and prayed that the defendants might be compelled to release their elder legal title to them, and that they might be quieted in their possession. Their bill was dismissed absolutely, and they have brought the case to this Court.
The first question we will consider will be—is their entry valid?
The Big Miami is a large stream running into the Ohio, on the opposite side, and was notoriously known by that name, at and long anterior to the date of the entry.
The distance from the mouth of the Big Miami to the mouth of the stream now claimed as Woolper, by the meanders of the Ohio, is eight miles and ninety poles; and six miles and a quarter in a direct line. There is no stream for several miles below and above the mouth of Woolper, running into the Ohio, of such size as to entitle it to the denomination of a creek. But the creek now claimed and known by the name of Woolper, was at *229 and shortly after the date of the entry, as is proven by some of the witnesses, generally called by the name of Stoney, and it is presumed, derived that name from the circumstance of several large stones lying at its mouth. On the other hand, there are several surveys and entries, made upon it some years before, which call it Woolper: one of two thousand acres in the name of David Woolper, made June, 1775, calling for beginning at the mouth of Woolper, seven and a half miles below the Big Miami, and running up the Ohio and out for quantity; and another in the name of Merry Walker, made on the 19th day of March, 1784, calling for the stream in question by that name.
From these facts it is apparent, that before and about the date of the entry in contest, the stream upon which it lies, was sometimes called and known by the name of Woolper, and that it probably derived its name from the fact, that a man by that name held the aforesaid claim upon it.
And this conclusion is strengthened, by the consideration, that it, for many years past, has gone and now goes by that name. Upon the whole, we are satisfied that, about the time the entry in question was made, that it was sometimes called by the one and sometimes by the other name. This circumstance, as it seems not to have been generally known by the name of Woolper, at the date of the entry, might be delusive to the subsequent locator, and would render the entry bad, if there had not been other objects of notoriety called for, and such description from them, as would enable him to find this creek, and to know with reasonable certainty, that it was the one intended.
An object of notoriety is given: namely, the Big Miami, a large stream notoriously known by that name, emptying into the Ohio, the great highway upon which persons most generally travelled in emigrating to this country. And as the entry must lie in Kentucky, and calls for lying about a mile and a half from the mouth of Woolper, which is called for as a creek about eight miles below the Big Miami, the subsequent locator must reasonably have concluded that, Woolper emptied into the Ohio below and on the opposite side from the Big Miami. He *230 would, therefore, set out first to find the mouth of the latter stream, as the point approaching, in all reasonable likelihood, nearest to the mouth of Woolper, and as the point intended by the call, for the Big Miami. Arriving at the mouth, and measuring by the meanders of the Ohio, (which as has been settled by this Court, is the proper way to ascertain distances upon it,) at the distance of only ninety poles over eight miles, he would find the mouth of a creek of considerable size, emptying into the Ohio; and upon further search, he would find no other creek emptying into the Ohio for several miles above and below. He could not doubt that the creek found was the one intended, and especially when, upon further search and enquiry, he could find or hear of no other creek at all in the neighborhood, bearing the name of Woolper.
The term “about,” applied to distance in an entry, is to be disregarded, and the specified distance taken as tho’ it was not so qualified.
There is no fixed rule for determining whether a distance specified in an entry, from one point to another, upon a stream, is to be ascertained by measuring along the meanders, or upon a straight line. It depends upon the intention of the locator—to be ascertained by comparing the calls in the entry with the objects, obstructions, distance &c., upon the ground.
An entry (supra) calls to begin “about one and a half miles from the mouth of the creek;” according to the proof, the creek is of “the 2nd class” in size; in the spring, it is often swelled by
But the mouth of Woolper being found, the inquiry arises—how shall the beginning or locative call of the entry be found? And this inquiry has presented most difficulty. It calls for beginning about a mile and a half from the mouth of the creek. “About,” in a locative call, should be rejected, as has been frequently settled by this Court.
But how shall the distance, “a mile and a half from the mouth of the creek,” be measured? Shall it be by a straight line, or by the meanders of the stream?
We think from the size, depth and character of the stream, in the spring of the year, when this entry was made, and the difficulty of crossing it, which must have been done at least twice, to run a straight line, and the fact that there was no road, at the time this entry was made, leading up the creek, and no reputed distance upon it, as well as from the fact, that the locative call or beginning is on the creek, and is to be arrived at from the mouth of the creek, and no course or direction given to arrive at it, but the creek itself, that it may reasonably be presumed that, the locator intended that the meanders of the stream were to be pursued to arrive at it; and that it is more reasonable, under the circumstances of this case, to give that construction to the call, than to require the distance to be ascertained upon a straight line. The place of beginning being on the creek, a mile and a half *231 from its mouth, is so far, that an object could not have been seen from the one point to the other. Of course, as no course is given to measure upon a straight line, it would be first necessary to run an experimental line to ascertain the point of beginning. It could scarcely be presumed that, the locator took this trouble, considering the obstacles in crossing the creek, or that he intended to drive subsequent locators to take it, to ascertain his beginning, and especially when a much more easy, simple and certain method could have been adopted to arrive at the point, namely, by pursuing the course of the stream.
back water from the Ohio, rendering it difficult to cross it; which must be done, at least twice, to run the straight line a mile and a half up from the mouth; there was no road in that direction when the entry was made; the call is to begin on the creek, and the course by compass is not mentioned: held, up on consideration of these circumstances, that in measuring the distance from the mouth of the creek, to find the beginning point, the meanders of the creek are to be followed.—But see the cases cited in the petition, and the additional opinion in this case post.
It has frequently been settled by this Court, that when distance from one object to another, as a locative call, is called for, on a road, that the distance is to be ascertained by the meanders of the road, and not on a straight line. Whitaker vs Hall, 1 Bibb, 7; Preeble vs Vanhoozer, 2 Bibb, 120, and sparsim. And distance is to be ascertained on the Ohio, by pursuing the meanders of the stream. Hite vs Graham and Grayson, 2 Bibb, 143. Also, that, if an entry calling for a beginning on a stream, and to run up or down, without designating a course, or that the stream is to be followed, is to be run by the meanders of the stream. Webb vs Bedford, 2 Bibb, 375, and sparsim. We are aware that, it has been settled, as a general rule, by the earlier decisions of this Court, that a call for distance from one object to another on a small stream, is be construed, on a straight line. But there were conceded exceptions to this rule; and one of those exceptions, intimated in one of the earliest decisions upon this point, to wit. in the case of Johnson vs Brown and Breckenridge, Printed Decisions, 62, is, that when insuperable obstacles to running a straight line intervene, the rule may be departed from, and the meanders of the stream pursued. There can be no fixed rule upon this subject applicable to all cases. The intention of the locator must be arrived at by construction, from the calls of his entry, compared with the objects and obstructions found upon the ground, and the distance and relative position of those objects. And from all these taken togeth *232 er whatever may reasonably be presumed to have been the locator’s intention, should govern.
Directions for surveying the entry.
To sustain an en try founded on a pre-emption certificate,the existence and position of the improvement, at the date of the entry, must be established by proof.
We think, therefore, according to this test, that the call in this entry, for a beginning on Woolper, a mile and a half from its mouth, when taken in connection with the character of the stream, and obstructions to be met with in running a straight line, and other circumstances appearing, must be construed to have been intended to be a mile and a half by the meanders of the creek, and would be so understood by subsequent locators who might feel an interest in searching for and fixing the true place of the beginning of the entry in question.
Fixing this as the beginning, the survey should be laid down to embrace the quantity called for in the entry, on the creek above, in a square, with the upper line bisected by a right line run from the beginning, demarking the general course of the creek, and the lower and upper lines ran at right angles with such right line, and the side lines parallel to, and at equal distances, at right angles from it. If the lower line, when thus run, shall strike the Ohio river, before it intersects with the side line, then shall the Ohio be meandered so far as to intersect the side line, and the quantity taken off by the Ohio, made up by an extension of the lines, still preserving the square figure as near as may be permitted by the Ohio.
For so much of the land in contest as shall be embraced in common by the complainant’s patent and their entry, when thus surveyed, they have the better equity, unless the entry under which the defendant’s claim shall be adjudged superior.
It cannot be sustained. The position of the improvement which is called for, is not shown or identified by any witness; nor is its existence at the date of the entry or certificate proven by any other witness than Smith, whose testimony, under the various disparaging circumstances made to bear upon it in this record, cannot be relied on
But several objections are raised by the counsel for the defendants, against the right of the complainants to sustain their bill; some of which only we deem necessary to be noticed.
An objection to a deed, as evidence, comes too late here, when it was read, without objection, on the trial below.
A deed under which possession has been held for thirty years, maybe read, without proof of its execution.
A conveyance of all a grantor’s lands within a certain district of country, with a reservation of so many acres, to be taken at his election, in any part of the premises, vests the grantees with a title to the whole—subject to the grantor’s right to restoration of the quantity reserved, whenever he shall make his election. See the additional opinion, post.
The deed from Charles Minn Thruston under which the complainants claim, was made on the 12th day of October, 1787, in the State of. Virginia, where he resided, to John, Buckner and Charles Thruston; by which he conveyed to them all “his deeded and undeeded lands, entries, warrants &c., on the western waters, and on the west side of the Alleghany mountains, with the express reservation of one thousand acres, to be taken at his election, in any fart of the above-granted premises, to be used or disposed of as he shall think proper.”
This deed is witnessed by four witnesses, and has never been recorded. The hand-writing of the grantor is proven by Henry Banks, who is not a subscribing witness, and no proof made that the witnesses are dead. And it is objected—first, that the deed is not properly proven and cannot be regarded by this court; and second, that the reservation of the thousand acres by the grantor, may cover the very land in contest, and therefore the complainants have shown no title to it which authorizes a decree in their favor.
The first objection cannot be sustained, for at least two reasons: first, the deed was read on the trial below without objection, and it is too late to raise the objection in this court. Second—the deed is more than thirty years old, and is consistent with the possession which has been held under it, for near thirty years.
The second objection is equally untenable. The legal title must be deemed to have passed to the whole, with a right reserved to the grantor, to select and take to himself one thousand acres, in any part of the land conveyed, which he may choose. And until he makes the choice and designation of the thousand acres, the grantees may hold, possess and enjoy the whole.
If this be not the construction, or if that contended for by the defendants, be the proper one, then may the same objection be raised to any other thousand acres embraced in the connection, for which they might bring suit, and instead of their having title to all but the thousand acres, to be selected and taken by the grantor, they would have title to none, until the election and designation should be made, and might be defeated in any action *234 which they might bring for any part of it. We cannot indulge in such a construction.
Warrants and entries were assignable by the laws of Va., and were not embraced by the champerty aetof 1786, S.L.284,) which prohibited, sales of land, unless the vendor had been in possession one whole year next before. And a formal deed of land for which thegrantor has only an entry—no patent having issued— only operates as an assignment of the entry, and is not within the act. See the additional opinion, post.
Where it appears that a party in the possession of land, entered originally under, or as a co-tenant with, others, a conveyance of the land made by them, cannot be deemed chain pertous, though it may also appear, that he has purchased an adversary title and claims under it. Such purchase will be considered as having been made for the common benefit of all the co-tenants: nor as changing a possession held for all, into an exclusive one, unless a renunciation of the allegiance, or cotenancy, is demonstrated by clear and well defined acts.—Those deriving possession from such a tenant, will be in the same condition.
*234 It is next objected that, as the deed was made while the Virginia act of champerty of 1786, was in force, which requires that the grantor shall have been in possession one whole year, next before he makes a conveyance, that the deed in question is champertous and void.
Warrants and entries, by the laws of Virginia, were assignable, and such assignments were not embraced by the above acts, as was determined by this Court, in the case of Oldham vs Rowan, 4 Bibb, 546. And it has been determined by this Court, recently, that, when a deed is made before the patent issues, as was the case here, it can have no other effect or operation than to pass the entry as an assignment, and is no more champertous than if an assignment had been made in the usual form. And the more especially, should that construction be given to the deed in question, as it purports on its face to convey all entries, warrants, &c.
It is next objected that the conveyances made by Payne and others, were champertous, within the provisions of the act of 1824; as they were made while Sebree and others claiming under him, were in adversary possession under Phillips’ patent.
Sebree entered while he was co-tenant with the complainants, under an executory contract for the purchase of an undivided third of the land embraced in their patent, and should be construed as holding consistent with their title, and not adverse, and the more especially, as he had no shadow of title or authority under Phillips’ patent, and it does not appear that he set up himself as holding adversely to the title of his co-tenants. Those deriving possession from him, would-stand in his condition, and occupy the same relation to his co-tenants. Those deeds cannot, therefore, be deemed champertous.
Some of the witnesses speak of Sebree having claimed under Phillips; but none of them speak of his having claimed adversely to the Thrustons, or in opposition ta their claim, or the claim which he held under them, and we cannot, by inference or construction, impute to him such infidelity to his co-tenants, if the law would even *235 permit him, considering the relation which subsisted between them, to act so faithlessly towards them. He may have claimed under them, and also, under the claim of Phillips, and in this way the proof may be reconciled. Had he purchased up the claim of Phillips, while his reation of co-tenant or quasi co-tenant subsisted with the Thrustons, his purchase would have inured to the joint benefit of himself and them, as has been determined by this Court. And while that relation subsisted, it would seem equally to comport with good faith, to make his possession inure to their joint benefit, and, as in this case, it does not appear that he claimed the possession adverse to them, or had renounced his allegiance to them, by any specific or well defined act of renunciation.
The time that bars a bill in equity for land, runs only from, the date of the commencement of the adversary possession; or of some other notorious and distinct assertion of an adversary right, operating as notice of the claim; till which, it may be presumed that the other party had no notice of it; or was justified in considering it as abandoned.
Lapse of time is, also, urged as an objection to the complainant’s equity under their entry. Time will not commence running against a person in possession, nor will it commence running, in the general, in favor of an adverse claimant not in possession. Time runs in favor of a possession under a junior patent, and may bar the right of possession, and even the right of property under the elder grant. Until adversary possession is taken under the elder grant, or at least, some distinct and notorious act of assertion of right under it, to the land in conflict with the junior grant, there can exist no necessity for the junior grantee to file his bill to assert his better equity. And, indeed, until such assertion of right, or possession taken, he is not to be presumed to have had notice of the adversary claim, or if he had to presume that it would ever be set up. In this case, it is not shown that the complainants had any knowledge of Phillips’ claim, until some few years before they filed their bill, and if they had, they had reason to presume that Phillips had abandoned it, as he had left the country many years before, and had never been heard of.
Twenty years, or the half of it, had not run from the time of the assertion of right by Masterson and Miller, to the time of filing this bill, and the Thrustons holding under them, were in possession, by their tenants, before. Lapse of time cannot, therefore, be availing.
To authorize proceedings against unknown heirs, there must be an affidavit by each comp’t that they are unknown to him or her. The want of such affidavit is an available object’n here, notwithstanding a former reversal for want of proper parties, when the defect was not noticed.
There can be no decree ag’nst unknown heirs who are not made parties in legal form.
Compt’s asserting a better equity, under an elder entry and junior grant, to land which deft’s had recovered in ejectm’t-charge that the conveyance under which defendants claimed and recovered the land, purporting to be a deed from the patentee—was not made by him, but by one whom they fraudulently procured to personate him:—If the deed was valid, the heirs of the grantor were not necessary parties. If, upon the other hand, the deed was invalid, their rights (they not being parties,) would not be affected by a decree, requiring deft’s to surrender their title. And where the heirs have asserted no claim, and are not likely to do so, never having been heard of—the compt’s may elect, in the
It is also urged, that Phillips’ heirs are not yet before the Court. And the ground now assumed to sustain objection, is that they are proceeded against as unknown heirs, and no affidavit has been made by all the complainants, that they were unknown to each of them. This objection is good, as was determined by this Court, in the case of Jeffrey’s Heirs vs Hand’s Heirs, (7 Dana, 89.) Nor do we think that this question is concluded by the opinion of this Court, when this case was formerly here. The heirs of Phillips were not then before the Court, and no opinion then expressed can be conclusive upon them.
Nor can this Court now decree a surrender of their title, when it is apparent, that they are not now before the Court.
But if Phillips’ deed to Masterson and Miller is genuine and valid, then Phillips’ heirs have no interest, and they were not necessary parties. If it be invalid, (which is a matter more properly triable between Phil lips’ heirs and Masterson and Miller, and which cannot be annulled at the instance of the complainants in this case,) then, though the complainants may obtain a release from Masterson and Miller or those claiming under their deed, they may hereafter be harrassed by the heirs of Phillips, who cannot be concluded by the decree in this case, as they are not before the Court.
But as the complainants have never been disturbed in the enjoyment of their better equity, by the heirs of Phillips, and in all reasonable likelihood will never be disturbed by them, and as those heirs seem to be unknown, and may in fact have no existence, and as Masterson and Miller obtained the judgment in ejectment, and they and Chambers, who claim under them, seem to be the only persons who are asserting claim under the elder grant of Phillips, the complainants may, upon the return of the cause, at their election, take a decree against Masterson and Miller and Chambers alone, requiring them to release all their claim under Phillips’ patent, and surrender the possession, so far as the same may have been acquired within the bounds of the elder equity of the complainants, embraced, in common by their patent and en *237 try, when surveyed as directed in this opinion. Or they may, if they see fit, take the proper steps to bring the heirs of Phillips, before the Court, so that a decree may be taken against them also.
May, 6.
court below, to take a decree against the defendants, for a relinquishment of such title they acquired by their pretended deed; or to prepare their case for a decree against the heirs.
It is, therefore, the opinion of the Court, that the decree of the Circuit Court be reversed, and cause remanded; and the appellants are entitled to their costs in this Court.