## A. H. RIPPETOE ET AL. V. THOMAS DWYER.

1. PLEADINGS—TRESPASS TO TRY TITLE.—In an action of trespass to try title in the ordinary form, with the plea of not guilty, the equities of parties to the suit in the land in controversy, which was sold under a decree foreclosing the vendor's lien, and which equities grew out of the relation of the parties prior to such sale, will not be inquired into. The equities must be set out in the pleadings.

2. TENANTS IN COMMON.—Parties acquiring titles to parts of a tract of land subject to an incumbrance by different instruments and at different times, there being no agreement between them respecting the title, are under no such relation to each other as to prevent one of them from purchasing such incumbrance, or an outstanding title to the whole tract, in his own right.

3. ORDER OF LIABILITY TO SALE UNDER A DECREE ENFORCING AN INCUMBRANCE.—Ordinarily, where parts of an estate incumbered by a mortgage or lien are sold at different times, such tracts are liable to be sold in the inverse order of the date of such sales, the latest first.

4. PRACTICE IN SUPREME COURT.—A sheriff's deed conveyed all the interest of the defendant in a foreclosure suit at the date of the decree; part of the land had been sold pending the suit; the point was not raised in the court below: *Held*, That the question as to the effect of the sheriff's deed will not be limited so as to exclude that sold pending the suit, and before the decree, when first raised in the Supreme Court.

5. SHERIFF SALE—LEGAL TITLE.—In case of a judicial sale made under a valid subsisting judgment or decree authorizing the execution or order of sale under which the officer acted, where the proceedings are regular, resulting in a deed to a purchaser, such purchaser takes a title which will be held valid until set aside by proceedings had for that purpose.

APPEAL from Washington. Tried below before the Hon. I. B. McFarland.

The facts sufficiently appear in the opinion.

*Giddings & Morris,* for appellant, cited and discussed Willard's Eq., 106, 119, 454, 251; Clowes *v.* Dickenson, 5 Johns. Ch., 235; Gill *v.* Lyon, 1 Johns. Ch., 447; 2 Story's Eq., sec. 1233; Stevens *v.* Cooper, 1 Johns. Ch., 425; Webb *v.* Maxan,

11 Tex., 678; 1 Story's Eq., 310, 405, 406; Giddings *v.* Steele, 28 Tex., 734.

*Sayles & Bassett,* for appellee.

I. As to the priorities between different purchasers of property chargeable with a lien, and as to which of the lands is to be first subjected to the charge, there is contrariety in the decisions.

"The general rule now acted upon by courts of equity, is, that where there is a lien upon different parcels of land for the payment of the same debt, and some of those lands still belong to the same person, who in equity and justice owes, or ought to pay, the debt, and other parcels of the land have been transferred by him to third persons, his part of the land, as between himself and them, shall be primarily charged with the debt. This would seem highly reasonable as to the original incumbrancer. But it has been further held, that if he has sold or transferred different parcels of the land at different times to different persons as incumbrancers or purchasers, then, as between themselves, they are to be charged in the reverse order of the time of the transfers to them,—that is to say, the parcels last sold are to be first charged to their full value, and so backwards until the debt is fully paid; for it is said that the last purchasers are to take only as far as they may without disturbing the rights of the prior incumbrancers or purchasers, who, being prior in point of time, have a superiority of right. But there seems great reason to doubt whether this last position is maintainable upon principle; for, as between the subsequent purchasers or incumbrancers, each trusting to his own security upon the separate estate mortgaged to him, it is difficult to perceive that either has, in consequence thereof, any superiority of right or equity over the others. On the contrary, there seems strong ground to contend that the original incumbrance or lien ought to be borne ratably between them according to the relative values of the estates. And so the doctrine has been asserted in the

ancient as well as in the modern English cases on the subject." (2 Story's Eq. Jur., 1233*a*.)

The strong inclination of Story to the latter rule appears from another passage: "On the other hand, cases may easily be stated where apportionment of a common charge, or, more properly speaking, where contribution towards a common charge, seems indispensable for the purpose of justice; and accordingly it has been declared by the common law in the nature of an apportionment towards the discharge of a common burden. Thus, if a man owning several acres of land is bound in a judgment, or statute, or recognizance, operating as a lien on the land, and afterwards he aliens one acre to A, another to B, and another to C, &c.; then if one alienee is compelled, in order to save his land, to pay the judgment, statute, or recognizance, he will be entitled to contribution from the other alienees." (1 Story's Eq. Jur., sec. 477.)

II. The rule that the land remaining in the hands of the original debtor is first to be sold to satisfy a lien which is also a charge upon other lands which have been sold, was recognized by the parties to the suits above referred to for the foreclosure of the vendor's lien. The judgments of foreclosure were rendered in October, 1870, and did not, in their terms, relate to an antecedent period. The executions directed the sale of the interest possessed by the defendants Pressley and Perryman on the day the judgments were rendered, *i. e.*, the 17th and 21st of October, 1870, and the sheriff's deed purported to convey only such interest. On the day that the judgment was rendered, the defendants in those judgments had no interest in the land in controversy. The execution did not authorize the sale of this land, and the sheriff's deed does not undertake to convey it.

So far as this record shows, the only tracts sold by Pressley out of lots 43 and 90, subject to the vendor's lien, were the lot in controversy and the lot purchased by Rippetoe, and by him sold to Pflughardt. All of lot number 90, and the balance of lot 43, were at the date of the judgment unsold, so

far as this record shows; and the sale under execution of all the right, title, and interest of defendants Pressley and Perryman in lots 43 and 90, on the day the judgments were rendered, would operate to convey such unsold portions, which in law and equity were first liable for the satisfaction of these judgments. But it certainly would not pass title to portions which had been previously sold by Pressley.

It was competent for the holders of the notes, who were plaintiffs in these judgments, to abandon their lien altogether. (Murphy *v.* Johnson, 17 Tex., 216; Gentry *v.* Lockett, 37 Tex., 503; Cook *v.* Love, 33 Tex., 487; Toland *v.* Swearengen, 39 Tex., 447.) So they could have abandoned it in part, and limited the foreclosure to such property as remained in Pressley when the judgment was taken; and whether this was done by accident or design, the purchaser under such execution would take no higher right.

III. The title under which appellant holds was fraudulent.

The circumstances relied upon to establish fraud which vitiated the sheriff's sale are—

1. The debt upon which the judgments were rendered had been discharged; the control of the suit had passed by agreement to the attorney of the defendant; and there were no *bona-fide* parties litigant.

2. The evidence shows an arrangement by which judicial proceedings were used for a speculative purpose.

The first purchase of the lien notes seems to have been made by Perryman and Pflughardt and their attorney, but before the sale is made all the money so advanced by Perryman and Pflughardt is refunded to them, and the defendant Rippetoe holds the title acquired at the sheriff's sale, on account of himself and their attorney.

3. The property did not bring one-fortieth of its value. In a short time after the sale, defendant realized, in gold, by his "compromises," over twenty-six times the amount of his bid in currency. (Allen *v.* Stephanes, 18 Tex., 658; Chamblee *v.* Tarbox, 27 Tex., 145.) In the case at bar, Wilkins, who had

bought from Rippetoe, and to whom the tenant in possession would look for reimbursement, says "that he had a conversation with Dr. Rippetoe about the sale, and he thought Rippetoe was bound to protect him,   *   *   *   *   *   *   and in consequence of what Rippetoe said, did not attend the sale."

The impression of Wilkins, that the sale was made in the interest of the purchasers under Pressley, might have been the general impression and the cause of the notably small price for which the property was sold.

Another circumstance leading to the same conclusion, was the transfer of the notes to one of the defendants, he assuming all costs, and the subsequent control of the case by his attorney, who took the judgment against his own client.

In Mackay v. Martin, 26 Tex., 57, it is said to be questionable whether a purchase by an attorney under his client's execution, over which he had control, would not be deemed, in itself, invalid in England; and the chief justice, delivering the opinion, quotes the observation of Lord Thurlow, cited by Chancellor Kent in Howell v. Baker, 4 Johns. Ch., 118, "that no attorney can be permitted to buy in things in a course of litigation, of which litigation he has the management. This, the policy of justice will not endure."

In the case last cited, a large body of land and a number of town lots of great value were sold together to satisfy a judgment for a small amount, and the court say:

"It is scarcely possible that a sale in gross, pursuant to such a levy upon a mass of property, without any specific description, embracing undefined and unascertained interests, could be a fair sale of the property for its full value."

In Ballard v. Anderson, 18 Tex., 377, it is held that the sale in gross of distinct parcels of property is void: "There could be no device by which property could be more ruinously sacrificed than the sale of large masses and distinct parcels of it together. In Tiernan v. Wilson, 6 Johns. Ch., 412, the sheriff put up two lots of land, amounting to 466 acres, for sale together, and they were struck off for $13.

The chancellor declared that the sale of the interest in the two lots was an abuse or breach of trust; any ten acres from either of the lots would probably have raised a sufficient amount; that to sell so large an amount was calculated to raise distrust as to the title and destroy the value of the sale."

GOULD, ASSOCIATE JUSTICE.—This is an action of trespass to try title, in which Dwyer recovered of Rippetoe part of lot 43 in the town of Brenham, claimed by the latter as a purchaser at a sheriff's sale under two judgments rendered in October, 1870, foreclosing a vendor's lien on lots 43 and 90, as against W. B. Pressley, the original purchaser and maker of the notes sued on; and Perryman joined as claiming an interest in the lots, and claimed by Dwyer under a conveyance made by Pressley to Jennings on February 19, 1861, after suit brought on one of these purchase-money notes. The validity of the foreclosure sale under which Rippetoe claims was the question at issue, the only pleadings on the part of plaintiff being an ordinary petition in trespass to try title, claiming rent; and on the part of defendant, the plea of not guilty. Pressley purchased the two lots of Browning in 1859, his deed reciting the unpaid purchase-money notes, and on the same day that he made the deed to Jennings he executed another deed, conveying to Erwin a different part of the same lot, number 43. This latter deed was filed for record at 3 o'clock P. M. of the day of its date, whilst that to Jennings was filed at 5 o'clock P. M. of the same day; and it is claimed that this priority of record is sufficient to show that the deed to Erwin was first made. Rippetoe purchased from Erwin; and in May, 1861, sold, by deed with warranty, to Prindle; who sold to Wilkens; who, in May, 1866, sold, also with warranty, to Perryman and Pflughardt. One of the suits on the purchase-money notes (they were both in favor of assignees) was taken by appeal to this court, and the judgment reversed in 1867; and at a time when both suits were pending "Perryman and

Pflughardt, and their attorney, purchased from Giddings & Giddings, attorneys of plaintiffs in those suits, the two notes in suit, with the understanding that the suits were to be continued to judgment for their benefit, and to be subject to the control of Perryman and Pflughardt." Rippetoe afterwards, in connection with the attorney, became the owner of the notes, and was so at the time that the foreclosure sale was had, at which sale he bought in the lots for the sum of $100. Rippetoe claimed that the object of Perryman and Pflughardt in purchasing the notes was to protect that part of lot 43 which they owned; and that his object was the same, he being responsible by reason of his warranty to Prindle, under whom Perryman and Pflughardt claimed. At the time of the foreclosure sale the lots were worth three or four thousand dollars, and Rippetoe subsequently—mainly by sales with warranty, and partly by compromises with parties claiming portions of these lots under Pressley—realized from his purchase over $2,400 and another lot.

Upon this state of facts, (there is other evidence which it is not deemed material to state,) the court instructed the jury, in substance, that Rippetoe acquired no title to the lot in controversy by his purchase at sheriff's sale, and that at the most he was only entitled to a ratable contribution for the amount paid by him in discharge of the vendor's lien.

The court also instructed the jury, that if the sheriff's sale was fraudulently made, by the connivance or with the knowledge of the defendant Rippetoe, it was absolutely void.

In support of the charge of the court, it is claimed that the various purchasers from Pressley (all of whom took their respective purchases subject to the lien for the unpaid purchase-money) held subject only ratably with the others, "according to the relative values of the estates," and without regard to priority of time in their purchases. In the recent case of Miller *et al. v.* Rogers *et al.*, (present term,) this subject was considered, and it was said to have "often been held, with some conflict of authority, that as between different parties

who purchased land from the mortgagor before such [foreclosure] suit, the land of the last purchasers shall be successively and inversely resorted to before the lands of the preceding purchasers." Such we are disposed to believe, both on principle and authority, to be the better doctrine. But it is claimed, and it is so held in the case just cited, that at all events the rule of equity is, " that when a part of the lands are still in the hands of the mortgagor they should be sold first, before those sold by him are resorted to in a suit to foreclose the mortgage." But, certainly, in the ordinary case of a foreclosure of the lien on all of the property subject thereto, such equities must be set up in the pleading of the defendants, either in the foreclosure suit, or in some subsequent equitable procedure.

In this case, not only is there no pleading setting up such equities, but there is no evidence showing affirmatively that unsold parts of lots 43 and 90 remained in Pressley's hands. We may dismiss, then, without further consideration, the question of the order of liability, or the rights of contribution between the different purchasers under Pressley. The charge of the court assumes that Rippetoe occupied such a fiduciary relation to Dwyer and the others holding under Pressley, that any title acquired by his purchase would be in trust for them. If he and Dwyer had been joint tenants, or co-partners, or tenants in common holding under the same instrument, his purchase of an incumbrance on the estate would be held, " at the election of his co-tenants, within a reasonable time, to inure to the equal benefit of all the tenants, upon condition that they will contribute their respective ratios of the consideration actually given." See Roberts *v.* Thorn, 25 Tex., 785, where this subject is considered, and the conclusion reached that tenants in common, acquiring their interests under different instruments at different times, and there being no agreement between them respecting the title, are under no such relation to each other as to prevent one of them from purchasing an outstanding title or incumbrance. Here, Rip-

petoe at no time was ever a tenant in common with Dwyer. At one time he held under Pressley a different part of lot 43 from that claimed by Dwyer, and, by reason of his warranty, he was interested in the removal of the common incumbrance. We are unable to see how that fact disqualified him from purchasing otherwise than in trust for Dwyer and others; and in the absence of authority supporting the doctrine laid down in the charge, we hold it to be erroneous. If the judgments under which the foreclosure sale was had were subsisting and unsatisfied, Rippetoe's purchase thereunder, at a regular sale, gave him a title superior to that of Dwyer, notwithstanding there may perhaps have been equities which Dwyer and others could, at least, perhaps, at one time have asserted.

The sheriff's deed purports only to convey the interest possessed by Pressley and Perryman on the day the judgments were rendered, and, it is claimed in appellee's brief, does not affect those parts of the lots which were conveyed by Pressley before that time, not held by Perryman. The record contains no evidence that any such point was made in the court below; and as no authority has been adduced for limiting the effect of the judgment of foreclosure and the order of sale by the deed of the sheriff, we will only say that we do not regard it as a good ground for refusing to reverse the judgment.

The court submitted to the jury various instructions on the subject of fraud in the foreclosure sale. Our opinion is, that in case of a judicial sale made by virtue of a valid subsisting judgment or decree authorizing the execution or order of sale under which the officer proceeds, where the proceedings are regular, resulting in a deed to the purchaser, he takes a title which is valid until the sale is set aside. (Owen *v.* City of Navasota, 44 Tex., 522, and authorities cited.) However liberal our laws in admitting evidence under the plea of not guilty in cases of trespass to try title, there is no authority for granting such affirmative equitable relief as avoiding a sheriff's deed for irregularities in the sale, when it is not prayed

for. (Ayres v. Duprey, 27 Tex., 594.) If there are any equitable grounds for setting aside the sale at which Rippetoe purchased, they should be set up in accordance with equitable principles,—proffering to do equity, and praying for the relief needed.

Under the view which we take of the case, the court erred in its charge, and in the admission of evidence on the issue of fraud in the sale at which Rippetoe bought.

For these errors, without discussing other questions, the judgment is reversed and the cause remanded.

REVERSED AND REMANDED.