McPheeters v. Wright.

Filed June 7, 1890; petition for a rehearing overruled Sept. 17, 1890.

———————◆———————

No. 14,276.

## McPheeters v. Wright.

SCHOOL LAND.—*Purchase.*—*Forfeiture of Contract.*—*Re-Sale.*—*Outstanding Lien.*—*Tenants in Common.* A., the assignee of a certificate of purchase of school lands sold in compliance with section 4345, R. S. 1881, occupied the land until his death. At his death his children inherited the land as tenants in common, subject, by the terms of the will, to the widow's life-estate. The interest instalments remaining unpaid after the death of the widow, the land was resold under section 4347, R. S. 1881, and B. became the purchaser.

*Held,* that B., who was the owner, when the sale was made, of an undivided interest by purchase from one of the children, could not acquire title

McPheeters *v.* Wright.

by purchase at such sale against the owner of an undivided interest by purchase from another of the children. *Elston* v. *Piggott*, 94 Ind. 14, distinguished.

SAME.—*Forfeiture.—Effect of.—Surplus.*—A forfeiture, under section 4347, R. S. 1881, upon the failure of the purchaser of school lands to make payments, does not divest the title of the purchaser to the real estate, but simply authorizes the State to sell the real estate for its own reimbursement, the surplus going to the purchaser.

From the Noble Circuit Court.

*R. P. Barr*, for appellant.

*H. G. Zimmerman*, for appellee.

BERKSHIRE, C. J.—This is an action in ejectment. The appellee was the plaintiff and the appellant the defendant in the court below.

The appellant filed a cross-complaint, to which a demurrer was addressed, which was sustained by the court, and the appellant reserved an exception.

The main action having been put at issue the same was submitted to the court for trial, and after the evidence had been heard the court returned, at the request of the parties, a special finding.

The only alleged errors which we are called upon to consider are those which call in question the ruling of the court in sustaining the demurrer to the cross-complaint and its conclusions of law upon the facts found.

As our reasoning and conclusion as to the special finding are alike applicable to the action of the court in sustaining the demurrer to the cross-complaint, we will confine ourselves to the special finding.

After entitling the cause, the following is the special finding of the court:

" The court, having been by the plaintiff and defendant requested to find specially the facts and conclusions of law thereon in accordance with section 551 of the code of this State, finds specially the following facts:

VOL. 124.—36

" 1. That the lands described in the complaint, to wit, the northwest quarter of the northeast quarter, and the northeast quarter of the northwest quarter of section 16, township 33 north, of range 10 east, in Noble county, Indiana, were, on the 12th day of April, 1847, part of the congressional school lands of said township.

" 2. That on the said day the said lands were, by the county auditor and the school commissioner of said county, duly and legally sold to one Adam Dingman ; the former parcel for $229 and the latter tract for $160, and that at the time thereof the purchaser paid down $57.25, being one-fourth of the purchase-money, and also paid $12.02, one year's interest in advance.

" 3. That on the last day named the auditor and school commissioner executed and delivered to said purchaser a certificate of purchase for each parcel separately, which certificates of purchase were, on the said 12th day of April, 1847, recorded by the auditor in book A of commissioner's record, on pages 555 and 556.

" 4. That, on the 3d day of October, 1853, said purchaser assigned each of said certificates of purchase to one Nicholas Skeels, which assignment was duly acknowledged before the county auditor.

" 5. That said instalments of annual interest on each parcel were paid by the said Dingman until the assignment in 1853, and then by the said Skeels until his decease, in the year 1854, each successively occupying and making valuable improvements on said land, and thereafter by Julia A. Skeels, the widow of said Nicholas Skeels, until the year 1867, when she died.

" 6. The interest instalments on said purchase-money remained unpaid on the 5th day of April, 1883, for the years, to wit, 1877, 1878, 1879, 1880, 1881, 1882, 1883, the interest having been paid each year in advance up to and including April, 1876, the payment made in April, 1876, being for the year ending April, 1877.

" 7. That, on the 26th day of February, 1883, the said annual instalment of interest for said several years remaining unpaid, and certain portions of the principal being due and unpaid, the county auditor and county treasurer declared the original contract of purchase and sale forfeited, and immediately on said day caused said lands, and each parcel thereof, to be separately advertised for sale on the 5th day of April, 1883, at the court-house door, in Albion, said Noble county, by publishing notices of said sale, one notice for each of said parcels separately, duly signed by the auditor and treasurer, and published in the Weekly News, a newspaper of general circulation, printed and published in said county, for four successive weeks, the last of which publications was one week prior to the date of the sale, and that a copy of each notice of the sale of each parcel was also posted at the court-house door of said county four weeks and more prior to the day of sale, and also that a copy of each one of said notices of the sale was posted in three public places in Green township, said county of Noble, being the township in which said lands to be sold were situated.

" 8. That the notice for the sale of the northwest one-fourth of the northeast one-fourth recited that there was due on the principal, $51.75, on unpaid interest instalments, $24.84, in all, $76.59, to which was to be added all costs and damages at date of sale, and that the notice for the sale of the northeast one-fourth of the northwest one-fourth recited that the principal due thereon was $120, unpaid interest, $57.60, in all, $177.60, to which were to be added costs and damages to day of sale.

" 9. That on the day of sale, to wit : April 5th, 1883, there was due on the N. W. one-fourth of the N. E. one-fourth, the following : Amount of principal due, $51.75, interest due, $24.84, printer's fees, $7.10, and treasurer's fees, $2, five per cent. damages, $3.82, sheriff's fees, $2.80, certificate of purchase and recording same, $3 ; total, $95.21.

" 10. That on the day of the sale there were due on the

N. E. one-fourth of the N. W. one-fourth, the following amounts: Of principal due, $120; interest due, $57.60; printer's fees, $6.75; auditor's and treasurer's fees, $2; five per cent. damages, $8.88; sheriff's fees, $2.80; certificate of purchase and recording, $3; total, $201.03.

"11. That on the 15th day of April, 1883, in pursuance of said notice the county auditor sold the said N. W. one-fourth of the N. E. one-fourth of said section 16, at the court-house door of Noble county, in the town of Albion, Noble county, Indiana, at public auction, to the plaintiff, John B. Wright, for $700; and at the same time and place said auditor, in like manner, sold the N. E. one-fourth of said section to the plaintiff for $800, the county treasurer attending thereat, and taking an account thereof.

"12. That on said purchase-money the purchaser, Wright, immediately upon such sale, paid down the sum of $175 on the purchase of the N. W. one-fourth of the N. E. one-fourth, and the further sum of $42 interest on the purchase-money in advance; and the said Wright also, upon the purchase of the N. E. one-fourth of the N. W. one-fourth immediately paid down the sum of $200, and the further sum of $48 interest in advance on the purchase-money.

"13. That immediately upon the sale and payment of the one-fourth of the purchase-money and interest, the county auditor and county treasurer executed and delivered to the plaintiff, as such purchaser, a certificate of purchase for the northwest quarter of the northeast quarter of said section, which was by the auditor duly recorded in commissioner's record book N, page 240, and also in like manner and at the same time, the said county auditor and county treasurer executed and delivered to said purchaser, Wright, a certificate of purchase for the northeast quarter of the northwest quarter of said section 16, which was by the county auditor recorded in commissioners' record, in book N, page 239.

"14. The court further finds that said Nicholas Skeels died about the year 1854, leaving surviving him several

McPheeters *v.* Wright.

children by different wives; that the plaintiff's mother was the last wife of said Nicholas, by whom he had one child living at the decease of said Nicholas; that by the last will of said Nicholas Skeels, executed on the 18th day of May, 1854, and which will was, upon the 21st day of June, 1854, duly proven and admitted to probate in the office of the clerk of the common pleas court of said Noble county and duly recorded therein on pages 205 and 206 of the record of wills, he, the said Nicholas, devised the lands in the complaint described to his widow by the following provision therein contained, to wit: ' I give and bequeath to my beloved wife, Julia Ann Skeels, all my right, title and interest in the northeast quarter of the northwest quarter of section 16, and the northwest quarter of the northeast quarter of said section, both in town. 33 north, of range 10 east, in the county and State aforesaid, supposed to be eighty acres, for her own benefit during the term of her natural life, or so long as she remains my widow.'

"15. That said Nicholas Skeels, at the time of his decease, was residing on said land, and after his decease his said widow, Julia Ann Skeels, with her daughter, who was then a minor and was the youngest of said children of said Nicholas Skeels, continued to reside on and occupy said premises, said widow residing thereon until her death, in 1867; that said daughter resided with her mother as a member of her family until after her majority, when she was married to one Abraham Schedule; that after her said marriage she and her husband resided on said premises and farmed the same for ———, and the said Schedule paid the widow rent therefor; and that one of the sons of said Nicholas Skeels also for a time resided on said premises, farmed the same and paid the widow rent therefor; that said widow paid the taxes accruing on said land from the year 1854 to the year 1867, and paid the several instalments of interest accruing on said contract of purchase of April, 1847, up to her death, and that there

is no other evidence as to whether or not she elected to take under the provisions of said will.

"17. That since the death of said Julia Ann Skeels, in 1867, the annual interest instalments on said original contract of purchase have been paid by the plaintiff up to and including the year 1876.

"18. That on the 25th day of March, 1880, one Caleb Skeels, son and heir at law of said Nicholas Skeels, deceased, conveyed by quitclaim deed all his interest in said land to the defendant, said deed being recorded on the —— day of ——, 1880, in deed record 45, page 21, of the record of deeds of Noble county, Indiana, said conveyance being made in consummation and completion of an oral contract made April, 1879, between defendant and said Caleb, whereby in consideration of $100 said Caleb agreed to convey to defendant his interest in said premises; and that under said oral contract defendant, on said —— day of April, 1879, entered into possession of said premises, made improvements thereon of the value of $300, and has ever since remained in possession of the same, claiming title to an interest therein under said deed.

"19. That on the 28th day of October, 1881, one Rebecca Jones, a daughter and heir at law of said Nicholas Skeels, conveyed by quitclaim deed to the plaintiff all her right, title and interest in said land, and that the plaintiff thereafter and up to the time of said auditor's sale of said land, on the — day of April, 1883, claimed a title and interest therein under said deed; but since he received said auditor's certificate of purchase at said sale, he has disclaimed any interest therein under said deed, and did not when this suit was commenced, and does not now claim any interest in said land, except under and by virtue of said auditor's sale.

"20. That on the 7th day of April, 1883, the defendant being in possession of the premises, claiming title as aforesaid, the plaintiff and defendant made an oral agreement by

McPheeters v. Wright.

which it was agreed that the defendant should remain in possession of the house in which he was then living, on said premises, and the garden appurtenant thereto, situate in the southeast corner of said northeast quarter of the northwest quarter of section 16, township 33 north, of range 10 east, until September 1st, 1883, and the defendant then agreed to pay the plaintiff for the use of the same $20, part to be paid in work; that at and prior to that time the plaintiff and defendant had and still have an unsettled account for work and labor performed; that thereafter, in the month of ——, 1883, the defendant's minor son, by request of plaintiff and by direction of defendant, worked for him —— days, nothing being at the time said by either plaintiff or defendant as to what the same should be applied on, nor has any application of said work to the payment of said $20 been made by either party with the consent of the other; that defendant has ever since said April 7th, 1883, been in possession of said premises, claiming title thereto and refusing to surrender the same to the plaintiff as sole owner of the same under said purchase at said auditor's sale, but has never denied that the plaintiff had an interest therein in common with the defendant.

"21. The defendant is now in possession of said lands, claiming title to an interest therein by virtue of said purchase and said conveyance from said Caleb Skeels and not otherwise."

"And thereupon the court finds and files the following conclusions of law, based upon said special finding of facts to wit: And the court upon the facts found as aforesaid, states as its conclusions of law:

"The plaintiff was, when this suit was commenced, and now is, the owner of all the lands described in the complaint, and of each tract; that the defendant is unlawfully in possession of the same, and wrongfully and unlawfully keeps plaintiff out of possession thereof, and that plaintiff is entitled to recover possession of said premises, with one dollar damages,

and the costs of this action, and is entitled to have his title thereto quieted as against defendant."

Under the facts found there can be no question but that at the time of the sale made in April, 1883, and under which the appellee claims title, he and the appellant were tenants in common of the real estate in question.

Not that the appellee acquired any title to the real estate by inheritance from his mother, for the court could well conclude from the facts found that the widow, Julia Ann Skeels, elected to take under the will of her husband, and at the time of her death was only a life tenant.

From the facts stated we must come to the conclusion that Nicholas Skeels died intestate, except so far as he made provision for his said widow. He died, leaving his said widow and eleven children; subject to the widow's life-estate, his said children inherited as tenants in common the said real estate, the interest of each being equal to an undivided one-eleventh thereof.

At the time of the sale through which appellee claims title he was the owner of an undivided one-eleventh of said real estate by purchase and conveyance from one of the children of said decedent, and the appellant was the owner of an undivided one-eleventh of said real estate by purchase and conveyance from one of said children.

Not only were the appellee and appellants tenants in common as to said real estate, but they held title from one common source, to wit, Nicholas Skeels.

The question, therefore, which must rule our conclusion is, could the appellee acquire title by purchase at the auditor and treasurer's sale as against his co-tenant in common?

In our judgment he could not. This case may readily be distinguished from the case of *Elston* v. *Piggott*, 94 Ind. 14, which is relied upon by counsel for the appellee, and which no doubt influenced the conclusion reached by the court below.

We quote the following from the opinion in that case,

which may be found beginning at the bottom of page 25: "Appellee's counsel contend that the appellant is precluded from asserting title under the foreclosure sale, because he was, as they affirm, a tenant in common with Martha J. Piggott, and could not, therefore, buy in an outstanding lien and build a title upon it. The general rule unquestionably is, that one tenant in common can not, by purchasing an outstanding lien, acquire a title which will evict his co-tenant. This rule, however, is subject to many exceptions and obtains only where the relation of tenants in common exists in strictness, and where the relation is such as to require mutual trust and confidence. It is impossible to perceive how one who buys at a sale made by an assignee in bankruptcy of the husband's interest becomes charged in such a case as that embraced in our general question, with duties of trust and confidence to the wife of the bankrupt. The title is not a common one ; the interests are not reciprocal, and there is no fiduciary relationship created. The title is secured by virtue of a judicial sale, and not by the same instrument, nor from the same source, as that from which the wife's claim is derived. * * * It is not to be forgotten that the wife was bound both by the decree and the mortgage, and the case is, therefore, altogether different from one where the lien is created by the act of the law, as for taxes, *or where the encumbrance was created by a former owner through whom both parties claim title. In such case the burden is a common one. In the present case the burden rests alone on one of the tenants.*"

That part of the quotation which we have underscored covers just the case we have under consideration.

In this case the encumbrance, because of which the sale was made, and at which the appellee became the purchaser, was " created by a former owner through whom both parties claim title."

In 3 Sharswood & Budd Lead. Cases, American Law of Real Prop., following the head note, there is a learned discus-

sion under the " Rule that purchase of outstanding title by one co-tenant enures to the common benefit." Page 89 *et seq.*

The authors say : " An important result of the intimate relations existing between tenants in common, is that one will not be permitted to purchase and set up against his co-tenants an outstanding title, and from this it follows that, generally speaking, if one tenant in common take from a third person a conveyance of any title to an estate in the property held in common, such conveyance will enure to the benefit of all the tenants."

The following authorities are cited : *Van Horne* v. *Fonda,* 5 Johns. Ch. 409 ; *Ligget* v. *Bechtol,* 1 P. & W. 440 ; *Weaver* v. *Wible,* 25 Pa. St. 270 ; *Keller* v. *Auble,* 58 Pa. St. 410 ; *Lloyd* v. *Lynch,* 28 Pa. St. 419 ; *Knolls* v. *Barnhart,* 71 N. Y. 474 ; *Jones* v. *Stanton,* 11 Mo. 433 ; *Buchanan* v. *King's Heirs,* 22 Gratt. 414 ; *Titsworth* v. *Stout,* 49 Ill. 78 ; *Montague* v. *Selb,* 106 Ill. 49 ; *Bracken* v. *Cooper,* 80 Ill. 221 ; *Rothwell* v. *Dewees,* 2 Black, (U. S.) 619 ; *Lee* v. *Fox,* 6 Dana, 171 ; *King* v. *Rowan,* 10 Heisk. 675 ; *Tisdale* v. *Tisdale,* 2 Sneed, 596 ; *Brown* v. *Haman,* 1 Neb. 448 ; *Mandeville* v. *Solomon* , 39 Cal. 125 ; *House* v. *Fuller,* 13 Vt. 165 ; *Shell* v. *Walker,* 54 Iowa, 386 ; *Dillinger* v. *Kelley,* 84 Mo. 561.

We also cite the following additional authorities : 2 Story Eq., sec. 1211 ; 4 Kent Com. (12 ed.), p. 371 and note ; *Brittin* v. *Handy,* 20 Ark. 381 ; *Venable* v. *Beauchamp,* 3 Dana, 321 (28 Am. Dec. 74).

In a note to this case by the annotator it is said : " It is a well established principle in equity, that a person placed in a situation of trust or confidence with respect to the subject of a purchase, can not retain such purchase for his exclusive benefit. This is a general principle, applying to all persons who come within the rule that no party can be permitted to purchase an interest where he has a duty to perform inconsistent with the character of a purchaser. Joint tenants,

parceners, and tenants in common are within this principle, and, therefore a joint tenant, co-parcener, or tenant in common is not permitted to purchase in an outstanding title or encumbrance for his own exclusive benefit, or to set up such title as against his co-tenant. But such purchase will enure to the joint benefit of all co-tenants, upon their contributing to the expense of it, in proportion to their respective interests." See *Moon* v. *Jennings,* 119 Ind. 130.

A number of the authorities cited above are cited, and the following additional: *Swinburne* v. *Swinburne,* 28 N. Y. 568; *Picot* v. *Page,* 26 Mo. 398; *Duff* v. *Wilson,* 72 Pa. St. 442; *Davis* v. *King,* 87 Pa. St. 261; *Sullivan* v. *McLenans,* 2 Clarke (Iowa), 437; *Thruston* v. *Masterson,* 9 Dana, 228; *Gossom* v. *Donaldson,* 18 B. Mon. 230; *Funk* v. *Newcomer,* 10 Md. 301; *Flagg* v. *Mann,* 2 Sumn. 486; Freeman Cot. and Part., section 154; 1 Hill Real Prop. 815; 1 Washburn Real Prop. 430.

In *Van Horne* v. *Fonda, supra,* Chancellor Kent said: "I will not say, however, that one tenant in common may not, in any case, purchase in an outstanding title for his exclusive benefit. But when two devisees are in possession, under an imperfect title, derived from their common ancestor, there would seem naturally and equitably, to arise an obligation between them, resulting from their joint claim and community of interests that one of them should not affect the claim to the prejudice of the other. It is like an expense laid out upon a common subject, by one of the owners, in which all are entitled to the common benefit, on bearing a due portion of the expense. It is not consistent with good faith, nor with the duty which the connection of the parties, as claimants of a common subject created, that one of them should be able, without the consent of the other, to buy in an outstanding title, and appropriate the whole subject to himself, and thus undermine and oust his companion. It would be repugnant to a sense of refined and accurate justice. It would be immoral, because it would be against

the reciprocal obligation to do nothing to the prejudice of each other's equal claim, which the relationship of the parties, as joint devisees, created. Community of interest produces a community of duty, and there is no real difference, on the ground of policy and justice, whether one co-tenant buys up an outstanding encumbrance or an adverse title to disseize and expel his co-tenant. It can not be tolerated, when applied to a common subject in which the parties had equal concern, and which created a mutual obligation, to deal candidly and benevolently with each other, and to cause no harm to their joint interests."

The rule must be the same when applied to joint heirs as to joint devisees, and as the appellee and the appellant had each purchased from the heirs their position is the same as though their controversy was between the heirs themselves.

In 11 American and English Encyclopædia of Law, page 1082, under the head of "Joint Tenants," it is said: "*Purchase of Outstanding Titles.* The general rule is that a co-tenant's purchase of an outstanding title enures to the benefit of all, whether the several interests of the different tenants accrue under the same instrument, under different instruments, or by acts of law, and in some States this rule seems to apply, however the tenancy may have been formed, whatever the relation of the co-tenants with each other may have been, and from whatever source the outstanding title may have been acquired." In addition to the authorities cited already, the following are cited: *Clements* v. *Cates*, 49 Ark. 242; *Olney* v. *Sawyer*, 54 Cal. 379; *Boskowitz* v. *Davis*, 12 Nev. 446; *Grimm* v. *Wicker*, 80 N. C. 343; *Threadgill* v. *Redwine*, 97 N. C. 241; *Page* v. *Branch*, 97 N. C. 97; *Braintree* v. *Bottles*, 6 Vt. 395; *Rountree* v. *Deuson*, 59 Wis. 522. As supporting the second proposition, *Lloyd* v. *Lynch*, 28 Pa. St. 419; *Gossom* v. *Donaldson*, *supra*.

We quote further from the authority above: "But in other States this rule applies only when tenants stand in

McPheeters v. Wright.

some confidential relation in regard to one another's interest, so that it would be inequitable to permit one to acquire a title solely for his own benefit, in which case he will be treated as a trustee for the share of his co-tenants, but persons acquiring unconnected interests in the same subject are not, it appears, bound to any greater protection of one another's interests than would be required of strangers." To support the rule as last stated, *Roberts* v. *Thorn*, 25 Texas, 728, *Brittin* v. *Handy*, *supra*, *King* v. *Rowan*, *supra*, *Fentz* v. *Klotsch*, 28 Wis. 312, and *Buchanan* v. *King's Heirs*, *supra*, are cited. Our own State is in accord with the general rule. *Wilson* v. *Peelle*, 78 Ind. 384; *Bender* v. *Stewart*, 75 Ind. 88; *Elston* v. *Piggott*, *supra*. But see further upon this subject, 11 Am. and Eng. Encyc. of Law, page 1083, *et seq.*, and notes.

In a note to the leading case of *Keech* v. *Sandford*, 1 Leading Cases in Equity, W. & T. 44, it is said : " But tenants in common, probably, are subject to this mutual obligation, only where their interest accrues under the same instrument, or act of the parties or of the law, or where they have entered into some engagement or understanding with one another ; for persons acquiring unconnected interests in the same subject by distinct purchases, though it may be under the same title, are probably not bound to any greater protection of one another's interests, than would be required between strangers." The only case cited to support this note is *Matthews* v. *Bliss*, 22 Pick. 48.

The case is not an authority in support of the position assumed. The rights of tenants in common holding title under the same or different instruments were not even remotely involved in that case. SHAW, C. J., delivered the opinion of the court. He said : " Most of the principles and rules applicable to the case of procuring money on goods by false and fraudulent pretenses, and of avoiding and vacating contracts obtained by false representations, are applicable to this case. The gist of the action was the conspiracy of the three

defendants after having agreed upon a sale of the brig at a large price, to induce the plaintiff's agent, by a concealment of the fact that the vessel could be sold for such price, and by false and fraudulent representations, to sell the plaintiff's quarter part of the vessel, at a price much below that which they had so agreed to sell for. The court are of the opinion that the direction of the judge who tried the cause was correct in stating to the jury that the mere non-disclosure of the fact, within their own knowledge, that they could sell and had agreed to sell the brig for a higher price, would not be sufficient to support the action, and that they were under no legal obligation to disclose the fact, and that withholding it was not such a fraudulent concealment of the truth, as would of itself maintain the action. The court are of the opinion, that the tenants in common of a vessel, who are not engaged jointly in the employment of purchasing or building ships for sale, do not stand in such a relation of mutual trust and confidence towards each other, in respect of the sale of such vessel, that each is bound, in his dealings with the other, to communicate all the information of facts within his knowledge, which may affect the price or value. A different rule may prevail in respect to any contract for the use or employment of the common property, in which relation perhaps they may be deemed to place confidence mutually in each other. But as in common cases of tenants in common of a vessel, they are independent of each other in all matters of purchase and sale, and may deal with each other in the same manner as owners of separate property."

The case in its facts and in the conclusion reached by the court, is just as far away from the doctrine which it is cited to support as it well could be.

In *Roberts* v. *Thorn*, 25 Texas, 728, the note, *supra*, is quoted and followed, and the case of *Smiley* v. *Dixon*, 1 R. P. &. W. 339, cited in support of the conclusion of the court. But that case seems to be as far away from the question be-

fore the court in *Roberts* v. *Thorn, supra,* as was *Matthews* v. *Bliss, supra,* from the text which it was cited to support.

We quote again 3 Leading Cases, on Real Property, at page 91, as giving the author's opinion as to what was decided in *Smiley* v. *Dixon, supra,* including a quotation therefrom : " It is manifest that here there was no tenancy in common, for each purchaser bought a certain number of acres, which were set off, and not an undivided interest or share, and upon this ground the court went. HUSTON, J., in delivering the opinion of the court, said, after recognizing the general rule : ' In this case, these men did not purchase jointly, neither had anything by purchase from Maxwell ; they were not joint tenants nor tenants in common, and there was no priority between them. The bare fact that each had been cheated neither gave any right to the other, nor deprived him of the full and absolute right to purchase from the real owner when discovered. The State was the real owner, and Smiley purchased from the State by his actual settlement.' " *Roberts* v. *Thorn, supra,* was afterwards cited with approval in *Rippetoe* v. *Dwyer,* 49 Texas, 498.

In *King* v. *Rowan, supra,* it was held that there were two exceptions to the general rule as declared in *Van Horne* v. *Fonda, supra* (we quote from note to *Venable* v. *Beauchamp, supra*) :

" 1. Where facts wholly inconsistent with a trust are clearly made to appear.

" 2. Where all the parties hold by the purchase of different titles, even though all come from a common source."

In addition to the fact that the cases last above are not sustained by the authorities on which they assume to rest, they attempt to draw a distinction where there seems to be no solid reason for a difference, and are out of line with all of the authorities. See *Rothwell* v. *Dewees, supra; Bracken* v. *Cooper, supra ; Montague* v. *Selb, supra;* 3 Leading Cases Real Property, 92 : note to *Venable* v. *Beauchamp, supra.*

It may be said of the case of *Brittin* v. *Handy, supra,* that that was a case where the co-tenant's interest was sold on execution against him alone.

But it is claimed that as there had been a forfeiture of the contract, as provided in section 4347, R. S. 1881, the title was in the State, and not in the heirs of Nicholas Skeels, or their grantees, and therefore the purchase at the auditor and treasurer's sale was not a purchase of the interest of a co-tenant to the real estate. Had the appellant's title been divested by virtue of the section of the statute *supra,* the point would be well made. *Watkins* v. *Eaton,* 30 Me. 529 (50 Am. Dec. 637, 641); *Hurley* v. *Hurley,* 148 Mass. 444 ; *Reinboth* v. *Zerbe Run, etc., Co.,* 29 Pa. St. 139 ; Freeman Cot. and Part., section 159 ; *Lewis* v. *Robinson,* 10 Watts, 354 ; *Kirkpatrick* v. *Mathiot,* 4 Watts & S. 251 ; *Coleman* v. *Coleman,* 3 Dana, 398.

But we do not construe a forfeiture under section 4347 as having an effect to divest the title of the purchaser to the real estate, but simply to authorize the State to sell the real estate for its own reimbursement.

This is evident from the fact that it is provided that in case the real estate shall sell for more than a sum sufficient to pay the sum owing therefor, with interest and costs, and five per cent. damages, the residue when collected shall be paid over to the purchaser, or his legal representative.

If, when the contract is forfeited, the title vests in the State absolutely, there could be no reason why the surplus, after principal, interest, costs, and damages are paid, should go to the purchaser; it should fall back into the county treasury for the benefit of the school fund.

But it makes no difference how much the land brings, though the surplus be largely in excess of what the purchaser has paid out, he is entitled to it all.

The word " revert," employed in the statute, and as used in the law, simply means to return. Sweet's Law Dictionary.

Worcester's definition is : " To fall back into the possession of the donor, or of the former proprietor."

Webster has it : " To return to the proprietor, after the determination of a particular estate granted by him."

The real estate returns to, or falls back into the possession of, the State, to be disposed of for the benefit of the school fund, and the mortgagor, or his grantee as well, to be converted into money ; and after sale the proceeds to be distributed as we have already indicated.

As against the holder of the legal title the State can not withhold the land from sale, and thus deprive him of the surplus which may arise from the sale.

We are of the opinion that the court erred in its conclusions of law, and in overruling the demurrer to the cross-complaint.

What the effect may be if the appellant should fail to do equity within a proper time, we are not now called on to decide.

Judgment reversed, with costs, with directions to the court below to grant a new trial.

Filed May 26, 1890 ; petition for a rehearing overruled Sept. 17, 1890.