No. 1,882.

- JAMES W. MANDEVILLE, Respondent, *v.* MARIA S. SOLOMON, Appellant.

TENANTS IN COMMON. — PURCHASE BY ONE OF AN ADVERSE TITLE TO THE COMMON PROPERTY. — Equity does not deny to one tenant in common the right to purchase in an outstanding or an adverse title to the common property; but it will not permit him to acquire such a title solely for his own benefit, or to the absolute exclusion of the other.

·IDEM. — But the co-tenant must exercise reasonable diligence in making his election to participate in the benefit of the new acquisition.

IDEM. — Unless he make his election to participate in a reasonable time, and contribute, or offer to contribute, his proportion of the consideration actually paid, he will be deemed to have repudiated the transaction and abandoned its benefits.

APPEAL from the District Court of the Second District, Butte County.

This cause was before this Court at the July Term, 1867, and is reported in the 33d volume, page 39, of the California Reports.

The case is fully stated in the opinion.

*Wm. P. Daingerfield,* for Appellant.

We do not dispute the general proposition, "that where two tenants in common are in possession, under an imperfect title, there would seem naturally and equitably to arise an obligation between them, resulting from their joint claim and community of interests, that one of them should not affect the claim to the prejudice of the other."

This rule of law is based upon the fraud that might be perpetrated by one in the relation of confidence which is engendered by a joint ownership; but where no fraud is shown, but, on the contrary (as in this case), where every act has been open and above-board, no such rule can be invoked. The reason ceasing, the rule ceases. The authorities establish the doctrine, that it is not simply the acquiring of an adverse title, but the fraud which vitiates. (2 Story's Eq. Jur. Sec. 1541; *Sneed* v. *Altherton,* 6 Dana, 280; *Graham* v. *Fox, Id.* 176; *Smiley* v. *Dixan,* 1 Penrose & Watts, 441; *Loomis* v. *Loomis,* 28 Illinois, 454; *Boynton* v. *Winslow,* 37 Penn. State Reports, 315; *Pattison* v. *Horn,* 1 Grant's Cases, Penn. 301; *Jackson* v. *Moore,* 6 Cow. 706; 5 Bacon's Abridgment, 277; *Tucker* v. *Wood,* 12 Johns. 190; *Lewis* v. *Robinson,* 10 Watts, 354; *Absconder* v. *Kennedy,* 3 Grant, 379.)

There was no fraud or concealment shown on the part of P. L. Solomon, or of the defendant. The equity rule in all cases is, that persons wishing to avail themselves of the benefits, must *promptly* take upon themselves the burdens, and that *delay* is one of the strongest *insignia* of fraud and ill faith. That the delay in this case was unreasonable, and can only be accounted for upon the presumption, that the plaintiff

was waiting to see whether the investment would be a *paying* one or not, before he offered to take upon himself the burden of her purchase.

*Jos. E. N. Lewis,* for Respondent.

For the purpose of this action, it is sufficient that plaintiff and Solomon purchased the land in controversy of John Bidwell, under a deed *purporting* to convey the fee simple in that tract to them.   They entered into actual possession of that tract as tenants in common, claiming title to the entire tract.   The complaint charges that afterwards, to wit, about the second day of April, A. D. 1863, and while this plaintiff and said Solomon were the owners, and in the actual possession and occupancy of said last named tract, as owners thereof, as aforesaid, the other heirs of John Potter, deceased, set up some claim to the property, and to quiet the title of plaintiff and P. L. Solomon, P. L. Solomon purchased such outstanding title.   The fact that two or more persons are in the actual possession and occupancy of a tract of land, claiming the same as tenants in common, whether by deed or otherwise, establishes such a relation that neither one of the parties could purchase an outstanding title so as to *exclude* the other co-tenants from the benefit of that title, if such tenants will come in and contribute their *pro rata* of the expense of the same.   So inflexible is the rule, that such a purchase would not exclude such tenant, even if his co-tenant had purchased such outstanding title for the *express* purpose of cutting off the co-tenant.   Bacon says :   "A purchase of an adverse claim by one joint tenant in possession, does inure to the benefit of all the co-tenants." Also, "where one of several joint tenants or co-partners buys in an incumbrance on the joint estate, the purchase will inure to the benefit of his co-tenants, if they elect to participate in the purchase, upon condition of their paying their due proportion of its actual cost." (Bac. Ab. Title Joint Tenants, H. 2, p. 277 ; *Sneed's Heirs* v. *Altherton,* 6 Dana, 278 ; *Lee & Graham* v. *Fox,* 6 Dana, 176 ; *Williams* v. *Gray,* 3 Greenl. 207, quoted in Bacon, p. 279, on Joint Tenants.)

Each tenant in common is, as to the property, the agent of the other, and the law, as applied to the purchase of an outstanding title by agents, would apply in this case. (1 Story, Secs. 316, 323 ; 2 *Id.* Sec. 1195 ; Story's Eq. Secs. 315, 1211, 1211*a*; Story's Agency, Secs. 210, 211; 8 Vesey R. 337 ; *Van Horne* v. *Fonda,* 5 John. Ch. R. 407 ; *Farmer & Arnold* v. *Samuels et al.,* 4 Littleton R. 187 ; *Lee & Graham* v. *Fox,* 6 Dana R. 176 ; *Rothwell* v. *Dewees,* 2 Black. R. 618 ; *Fenable* v. *Bean,* Champ. 3 Dana, 324 ; 2 Mon. 298 ; 2 John. Ch. R. 33 ; *Rothwell* v. *Dewees,* 2 Black. 613.)

Wallace, J., delivered the opinion of the Court :

A decree was entered in this cause, in the Court below, directing the appellant to convey to the respondent an undi-divided interest in certain lands in Butte County, and her motion for a new trial being afterwards denied she prose-cutes this appeal.

It appears that one James Potter, since deceased, had, at the time of his death, an unconfirmed claim to a piece of land, called, in the record, "Potter's Half League." He left seven children surviving him, and a will—by the terms of which it was supposed that one of his infant sons, James K. Polk Potter, was the sole devisee of this half league. John Bidwell subsequently purchased the tract at a sale made by the guardian of J. K. P. Potter, under the direc-tion of the Probate Court, and received from the guardian a conveyance thereof. He subsequently, in 1862, sold and conveyed to the respondent, Mandeville, and to Perrin L. Solomon, since deceased, a distinct portion of the tract so purchased by him, and retained the balance himself. At the time of Bidwell's purchase, and also when he made the sale to Mandeville and Solomon, it was supposed that the title to the entire tract had passed to him at the guardian's sale.

Mandeville and Solomon entered into the possession of the tract they purchased of Bidwell, and remained in its posses-sion as tenants in common, until the death of P. L. Solomon, who departed this life on September 18th, 1863, and left the

appellant (his widow), the sole devisee of his interest in the land.

In April, 1863, Solomon was advised that the six other children of James Potter were the owners of, and were asserting claim to, the undivided six sevenths of the half league, by reason of its having, subsequently to the death of the father, been confirmed to the seven children, as his heirs at law, and Solomon, thereupon, commenced negotiations to purchase their title.

The claim of these six children was in the hands of William Neely Johnson for sale, and while the negotiations were proceeding between Solomon and Johnson, the latter, at the request of Solomon, called the attention of the respondent, Mandeville, to the fact, with a view to his joining with Solomon in the proposed purchase, but Mandeville then positively refused to do so.

Subsequenty, and before the consummation of the purchase by Solomon, the respondent, Mandeville, upon being applied to, personally, by Solomon himself, in the City of San Francisco, to unite with him in the purchase, again declined to do so.

Under these circumstances, Solomon proceeded and made a purchase of the interest of the six children of Potter to the entire half league. This purchase was made for $2,000 ; all but $100 of this sum he borrowed of one Meek, upon interest. The sum of $600 was paid in cash, and $1,400 was to be paid in thirty days thereafter, and a conveyance of the interest of the children was made directly to Meek, to secure him in the money advanced by him. This transaction was completed on the 24th day of April, 1863 ; and some three days thereafter, Solomon, who then resided in San Francisco, addressed a lengthy letter to Bidwell, at his residence in Butte County, and another similar letter to the respondent, Mandeville, at his residence in Tuolumne County, informing each of them, in detail, of what he had done in the premises, and requesting them each to furnish his proportion of the purchase price, and take the benefit of the purchase. Bid-

well, some time subsequently, did so, and received a conveyance for his portion of the Potter half league. The letter so addressed to the respondent, Mandeville, was mailed to him, directed to the post-office of his residence, but he never made any response whatever to it at any time. That letter is not produced in evidence, but the one written to Bidwell appears in the record, and is proven by the draftsman of both to be in the same terms as the one simultaneously sent to Mandeville. In that letter Solomon details, at length, the reasons which had induced him to make the purchase, and sets forth the danger to their common title which the claim of the Potter children threatened, as he had learned it from his counsel, O. C. Pratt, who had advised the purchase, provided the claim could be had for $2,500, or less. After stating that in effecting the purchase he had suffered much anxiety and difficulty, Solomon said, in the letter to Mandeville, as follows: "It stands you in hand, then, if you wish to participate in the fruits of my labor, that you make no delay in relieving me to the extent your proportion of the obligations I have thought myself compelled to incur. But I will here add, to the end that you may not misapprehend my motive or purposes, that if you do not concur in opinion as to the propriety of this purchase, you need not, in any respect, unite with me in it, as I had no authority from you to act in the matter." After stating that Meek, who had advanced the money, stood ready to take the interest which he thus offered to Mandeville, Solomon added: "Let me hear from you at once."

To this request, Mandeville, as we have said, never made any answer, nor did he ever claim the benefit of the purchase at any time thereafter during the lifetime of Major Solomon.

O. C. Pratt was the agent of Meek at the time this purchase was effected by Solomon, and as such agent advanced the money of Meek for that purpose, and received the conveyance to the latter as security for the advance. At the time of Solomon's decease, Meek still held this conveyance, and some three months after that event, Pratt repaid to Meek the moneys due him on account of the transaction, and Meek thereupon conveyed to Pratt, who received the conveyance,

to hold as security, as Meek had done.    At this time, J. C. Mandeville, a brother of respondent, was in occupation of the premises.    He was also equally interested with the respondent in the title, and Pratt called his attention to the fact that he had himself received the conveyance from Meek, and suggested to him the propriety of looking into the matter, but he seems to have made no response whatever to the suggestion, and though Pratt met him, as well as the respondent, subsequently and before March, 1864, neither of them seem to have manifested the slightest interest or concern in the purchase, or in what disposition would be finally made of it.    On the first day of March, 1864, Mrs. Solomon, the appellant, acquired the title from Pratt.    She paid for it—not with any part of the assets of the estate of Major Solomon, but with money that she borrowed for that purpose from a person in no way connected with the estate or its affairs.

It must be borne in mind that at the time she received this conveyance some eleven months had elapsed since her late husband had effected the purchase in the first instance; that the fact of the purchase having been made was well known to the respondent during all that time; that so far from its having been concealed from him, he had been importuned time and again by Solomon to participate in its benefits, and furnish his proportion of the expenses incurred in making it; that he was twice invited to do so before it had been actually completed, but positively declined on both occasions, and in so emphatic a manner in one instance that his interlocutor seems to have thought proper to explain to him that he had taken the liberty to mention the subject only at the request of Major Solomon himself.

. It should not be forgotten that after the purchase had been effected, a full and fair statement of every matter connected with it had been laid before him in writing, and it was then distinctly stated to him that it was for the purpose of enabling him to make his election as to whether he would become interested in the purchase or not.

It seems to us, that the circumstances here establish, beyond controversy, that the purchase by Solomon was in

the first instance fairly and openly made, not for the purpose of injuring the title of the respondent, but with a view to protect both himself and the respondent, and that the acts, declarations and conduct of the respondent persisted in during the lifetime of Major Solomon, and for long afterwards, including the time the appellant received the conveyance from Pratt, amount to a definitive refusal upon his part to participate in any way whatsoever in the transaction by which this adverse claim had been or was about to be acquired.

There is no appreciable conflict in the evidence upon these points.

The respondent, Mandeville, was himself sworn as a witness in the case; but he does not contradict or explain any of the evidence in that respect. He does not allude to the witness, Johnson, or say that he did not then decline distinctly to aid in the proposed purchase; nor does he deny that he, in an interview between himself and Solomon, again refused to join in the negotiation then pending; nor that he received the letter of April 24, 1863, informing him of the purchase in detail, and again tendering him the benefit of the consummation. All of these matters had been proven by the depositions of witnesses, taken on behalf of the appellant, and already on file in the case, when Mandeville testified. He doubtless knew of their contents when he was sworn, and did not deny their truth, and after they had been actually read in evidence he was not recalled or questioned concerning them. He does not pretend that he ever offered to advance any money at any time, to aid in the purchase, either before or after it had been effected until he made the formal tender to Mrs. Solomon in May, 1864, some two or three months after she had received the deed from Pratt.

We are by no means satisfied of the excuse which is made for the neglect to make this offer. He says, as a witness, that the reason why he did not tender his share of the purchase money, was, that Solomon was indebted to him in a greater amount of money than would be his share of the sum paid to Johnson on the purchase. If the fact of the

existence of this indebtedness were admitted, would it amount to an excuse for his not even offering to appropriate a part of that indebtedness to aid in the purchase? Could he not, if he intended to participate in the purchase, have notified Solomon that such was his intention, and that sufficient of this indebtedness might be applied for that purpose?

But it is evident, from the tone of the letter of Solomon, addressed to Mandeville, that the former did not acknowledge such an indebtedness at all, but supposed that if Mandeville participated he would furnish his proportion of money, and to that extent relieve Solomon in the payment of money to Meek. The proof that Solomon was indebted to Mandeville at all upon settlement of accounts, is far from satisfactory, and if he was so indebted, that constituted no reason why he should fail within a reasonable time to notify his election to participate in the purchase of this adverse claim.

Equity does not deny to a tenant in common the right to purchase in an outstanding or adverse claim to the common property; it, however, deals with the tenants after such a purchase is made. While it will not permit one of them to acquire such a title solely for his own benefit, or to the absolute exclusion of the other, it at the same time exacts of that other the exercise of reasonable diligence in making his election to participate in the benefit of the new acquisition; and having, upon its own principles of fair dealing, compelled the purchasing tenant to allow his co-tenant this opportunity, the latter will not be permitted to equivocate or trifle with the position thus afforded him, or to make it a means of speculation for himself, by delaying, until the rise of the land, or some event yet in the future, shall determine his course. Unless he make his election to participate within a reasonable time, and contribute or offer to contribute his ratio of the consideration actually paid, he will be deemed to have repudiated the transaction and abandoned its benefits. (See note to Keach & Sanford, 1 Lead. Cas. in Eq. p. 73; *Lee* v. *Fox*, 6 Dana, 176; *Weaver* v. *Webb*, 25 Penn. St. R. 270; *Lloyd* v. *Lynch*, 28 *Id.* 419.)

The application of this rule is decisive of the case at bar,

for we have seen that the respondent expressly repudiated the purchase both before it was consummated and afterwards, and that by his conduct and declarations during nearly one whole year subsequent to the purchase, and until long after Mrs. Solomon had acquired her title from Pratt, he manifested a settled purpose to take no part whatever either in the burdens or benefit of the acquisition.

We think, therefore, that the decree of the Court below should be reversed, and the cause be remanded for a new trial, and it is so ordered.