[Civ. No. 20507. First Dist., Div. Three. Aug. 12, 1963.]

ALBERT B. ANDERSON et al., Plaintiffs and Respondents, v. ASSOCIATED INVESTMENT COMPANY et al., Defendants and Appellants.

Byers, Howell & Elson, Fred K. Howell, Jr., and Fitzgerald, Abbott & Beardsley for Defendants and Appellants.

Breed, Robinson & Stewart and Ned Robinson for Plaintiffs and Respondents.

DEVINE, J.—There are virtually two appeals to be disposed of, because the issues in each of the controversies in which the parties are engaged are quite different, so they are considered separately in this opinion. The first controversy relates to the respective interests of the parties in a building and the second to claimed broker's commissions. For convenience, reference is made to the parties in the singular, because the spouses are but nominal parties and because, on the defense side, the partnership may be regarded as a single defendant.

I. APPEAL RELATING TO INTEREST IN THE BUILDING

*General Statement of Facts*

Respondent, Albert B. Anderson, a real estate broker, worked with appellant from about 1952, handling property exchanges and securing tenants for buildings constructed or acquired by appellant. In 1955, the El Dorado Building in Oakland was acquired by Associated by exchange for another building. Anderson earned commissions on the exchange of $15,000, and he puts this, with another $5,000, as his contribution to the purchase of a one-fourth interest in the El Dorado Building. Associated had contributed $73,000, its equity in the exchanged building. Respondent testified that the agreement was made in a conversation in which one of the appellant partners asked him how much of an interest he wished to buy, and that he replied, "I will take 25%," that the partner said, "Swell," that respondent rejoined, "You build them and I lease them," and the partner replied, "Right." A few days later, appellant executed and delivered a deed of a one-fourth interest to respondent, and respondent later recorded the deed. Appellant caused a recital of the existing deed of trust, and of respondent's agreement to assume. to be placed in the deed, while the parties were at the

title company. The books of the partnership showed at this time that respondent had a one-fourth interest in the building, although they show a diminishing interest later. A work sheet prepared by an appellant partner in 1957 charges respondent with 25 per cent of unpaid building costs. Respondent assumed liability to pay one-fourth of the existing loan on the building, and made one payment, $375, a quarter of the payment due. Respondent testified that he was told by one of appellant partners not to make more payments, because the loan had been set up incorrectly. A further loan of $645,000 became necessary, and respondent and his wife signed, with appellant partners, the note and deed of trust. The 25 per cent interest of respondent was admitted by an appellant partner, not only in conversations with respondent, but with his wife, his attorney, and his accountant (the last named gave some testimony which was momentarily contradictory, a fact which appellant makes much of, but the trial judge carefully went over the ground with the witness, and his testimony, as finally given, fully supports respondent's position).

The building, when purchased, was of four stories, but it was enlarged to seven stories and a penthouse. Respondent testified that appellant did not consult him about the development; appellant partners testified that they spoke to him, but one of them, Mr. Martin, testified that it had been clearly understood in the original agreement that respondent "wasn't to have a voice in the building." Another loan was negotiated, in amount $880,000, and as to this, the testimony of the parties is in direct conflict. That offered by appellant is that respondent was asked to sign, and refused. Respondent's testimony is that he was not asked to do so, that only once was he requested to make additional contribution, and that he replied that appellant had his money and all that appellant had to do was "dig into that pot and get it." By this, he said, he referred to some $26,000 in commissions for leasing which appellant owed him.

The $880,000 loan, a short-term loan, was made on notes signed by appellant partners, and secured by properties owned by them other than the El Dorado Building. As the building neared completion, a "take-out" loan, a long-term loan to repay all other loans and to repay advances made by Associated, was negotiated, in amount $1,650,000. Respondent and his wife signed the note and deed of trust with appellant partners. The note was secured by the El Dorado

Building and by property on Webster Street owned by Associated. The court found that had not the Webster Street property been put up as security the maximum loan available would have been $1,450,000. Associated managed the building and collected the income.

### The Judgment

The trial court adjudged that respondent has a 25 per cent interest in the building, and ordered an accounting whereby appellant would first be repaid, from income or sale price if the building were sold, any excess of its cash contributions over 75 per cent. The accounting showed that accumulated income was more than enough to repay such excess. The court did not make an allowance to appellant of any percentage over the 75 per cent as adjustment for the risk taken by appellant on the $880,000 loan. Nor did the court make such adjustment for the inclusion of the Webster Street property as security for the final loan, but did decide that Associated is entitled to have this property released from the loan and to have such payment as is required to effect the release.

### Contentions of the Parties

Appellant contends that the true agreement was in the nature of an option to respondent to buy "up to" a 25 per cent interest, and that in order to cause the option to ripen into the full 25 per cent interest, respondent was obliged to make contributions at the stages of development, equal to 25 per cent of the total and that appellant took a risk, on the $880,000 loan, which was not shared by respondent, so that his equity was reduced.

Respondent contends that he acquired a 25 per cent interest from the beginning, and that when demand was made on him for additional contribution, he authorized drawing against his commission account; that no demand was made for his participation in the $880,000 loan; that he did participate in the final loan, and has retained his 25 per cent interest throughout.

### Decision

■ Appellant cites three cases, *Stevenson* v. *Boyd*, 153 Cal. 630 [96 P. 284, 19 L.R.A. N.S. 525], *Smith* v. *Goethe*, 159 Cal. 628 [115 P. 223, Ann. Cas. 1912C 1205], and *Mandeville* v. *Solomon*, 39 Cal. 125, which hold that where a cotenant buys an outstanding claim against the property, the other cotenant must exercise reasonable diligence in making his election to participate in the new acquisition, and that he cannot delay until the rise of value or some other event deter-

mines his course. By analogy, argues appellant, respondent had to elect either to put up more money, directly or by the proceeds of a loan which he would engage to pay, or, failing this, to allow his cotenant's equity to increase and his own to diminish. If the analogy be assumed valid, nevertheless the opportunity of election must exist, and in this case respondent testified positively that no choice was put before him.

This leads us to the essence of appellant's contention, which is that respondent's testimony should not be allowed to prevail over that offered by appellant, the plea, understandable but unavailing, so often made by appellants. True, appellant claims that there is not actual conflict in the evidence, asserting that what was presented by respondent is inherently improbable, amounting to no substantial evidence at all, but this is refuted by the nature of the evidence. To some extent it is oral, and is contradicted by appellant's evidence, but it is far removed from that which could be nullified on appeal as worthless.

One or two arguments of appellant, upon which appellant is insistent, may be considered specifically, however. The first is that the testimony of one of appellant partners, to the effect that the deed was security only, was uncontradicted, and, therefore, could not under the circumstances be rejected. It is true that there was not specific rebuttal testimony on this subject, but this may have been because the trial was lengthy, and had every item of evidence been expressly refuted, would have been interminable.

The deed itself is a species of rebuttal. The presumption is that a deed is what it purports to be and one who seeks to overcome such presumption has the burden of producing clear and convincing proof. (*Beeler* v. *American Trust Co.*, 24 Cal.2d 1, 7 [147 P.2d 583] ; *Spataro* v. *Domenico,* 96 Cal.App.2d 411, 413 [216 P.2d 32].) The court certainly could find that the burden was not met. Also, appellant's contention is rebutted by respondent's original testimony, which, while not denying conversations later offered by the defense, is inconsistent therewith; and in the course of extensive cross-examination of respondent, he was not asked about any statement that the deed would be security only. Moreover, appellant was painstaking to add to the deed the assumption of the debt, while at the title company, but caused no reference to be made, in the deed or instructions, to any security transaction.

■ It is objected that the court accepted much of the testimony offered by appellant, but rejected the essential part. The trial court may believe some of the evidence offered by a party, and reject other evidence. (*Stadley* v. *Pine Island Coop. Assn.*, 203 Cal.App.2d 390 [21 Cal.Rptr. 418]; *Berger* v. *Steiner*, 72 Cal.App.2d 208, 216 [164 P.2d 559].)

■ Finally, the fact that the court did not award a percentage interest in the property to appellant because the Webster Street property owned by appellant was put up for the final, or long-term, loan is not shown to be in error. It is not pointed out to us that any demand was made of respondent, or any choice offered to him. Moreover, appellant had accumulated income from the building in its possession, which the court may have thought an adequate offset to the additional property put up as security by appellant.

II. APPEAL RELATING TO BROKER'S COMMISSIONS

Respondent's action includes counts for recovery of what the parties call, for convenience, the "outside commissions," that is, commissions for leases obtained by respondent for buildings other than El Dorado. The only point is the statute of limitations. The leases were obtained in a period commencing January 27, 1955, and ending November 15, 1956. Complaint was filed on November 25, 1958. Appellant set up the two-year statute on oral contracts. (Code Civ. Proc., § 339, subd. 1.) Respondent relies on an open book account, an open, mutual and current account, and a letter claimed to be an acknowledgment of the debt sufficient to overcome the statute of limitations. The trial court found in respondent's favor on all three counts, but decided against respondent on an alleged account stated, and respondent has not cross-appealed.

We shall discuss, first, the open, mutual and current account. The court found that an open, mutual and current account exists between the parties for commissions, in amount $55,949.70 diminished by the following amounts: desk, $343.20; Blue Cross, $453.70; payments on account (nine payments were listed); total, $29,421.30. Appellant contends that this finding cannot be sustained under (1) the pleadings, (2) the evidence, and (3) another finding of the court. Before discussing these contentions, it is necessary to give a résumé of the facts.

The parties had been doing business with each other since 1952 and, as related in the earlier portion of this opinion, had

a joint interest in a building. During the period January 27, 1955, to November 15, 1956, respondent obtained many tenants for appellant's other buildings. When he had secured a lease, he would write, in handwriting, a statement addressed to appellant, giving the name of the lessee, the date, the term of the lease, the rental and a calculation of the commission, by years of the lease, and the amount due him on each transaction. He would place the statement in a folder. There were three folders, one for each building. No immediate demand was made, however, for apparently the parties understood that because of the extensive financing required during expansion of appellant's activities, respondent would allow at least some of his commissions to remain with appellant. A fourth folder was kept by respondent, in which he entered all payments for commissions received. In 1957, meetings were held between the parties. Respondent had typewritten copies of the statements prepared and delivered to appellant. No objection whatever was made by appellant to the form of the statements (in fact, appellant asked respondent for "his bills"), and almost none (except as to minor calculations) as to the amounts except: (1) Appellant contended that respondent was not entitled to full commission where a lease was cancellable by the lessee within a given period until that period had expired. (The court decided in appellant's favor on this point.) (2) Appellant contended that there existed an offset on the lease to KLX in this, that respondent was obligated to pay $100 a month for advertising to KLX. (The court decided this issue, too, in favor of appellant, to the extent of declaring that respondent had the duty to make these payments not to appellant, but directly to KLX.) There was no contention at the meetings, nor at the trial, that the leases were not obtained for appellant's benefit. Appellant wrote a letter to respondent on July 24, 1958, conceding substantially the amount claimed by respondent except for the asserted KLX offset. On September 15, 1958, appellant wrote to respondent, stating that it would like to settle "our account with you." These events took place before the statute of limitations had run against many of the transactions, considered as oral contracts.

During the period when the parties were engaged in friendly relationship, appellant purchased Blue Cross insurance for respondent, at a cost of $453.70, and bought him a desk, at a cost of $343.20. No cash payment was made by respondent for these items and they are contended by him to constitute

reciprocal items, against his commissions, thus making up an open, mutual and current account. ▮ " 'For a mutual, open, and current account it is not necessary that the account be kept in any particular form, and it is immaterial which party keeps the account (*Carter* v. *Canty*, 181 Cal. 749, 754 [186 P. 346]), nor is it necessary that there be any written entry of the various charges on the account (*Millet* v. *Bradbury*, 109 Cal. 170, 173 [41 P. 865].)' " (*Parker* v. *Shell Oil Co.*, 29 Cal.2d 503, 513 [175 P.2d 838].) Appellant does not question the proposition that on the one side, respondent, there were the ingredients of an account, but contends that the two items which the court found to be reciprocal demands were not merely offsets but were actual payments which, when made, operated as a *pro tanto* discharge and terminated any mutuality of debit and credit. It is the rule that if actual payments are made, so that no credit remains on one side, there is no longer an open, mutual and current account. (*Rocca* v. *Klein*, 74 Cal. 526 [16 P. 323].)

▮ We consider, first, appellant's contention that respondent's pleading and pretrial statement designate the two items as payments to himself. Neither of those documents specifically identifies the two items, but appellant argues that the total amount of payments set forth in the complaint and pretrial statement could be arrived at only by inclusion in that total of the Blue Cross and desk items.

This is highly technical reasoning, and we believe the trial court was not obliged to follow it. Indeed, if one were disposed to follow such close arguments literally, one could point out that appellant, after unsuccessfully demurring to the common count, denied all of the allegations of the charging paragraph, which would include a denial of the fact that any payments were made.

▮ The argument that there was a finding that payments were made, including the two items referred to above, is unconvincing. Here, again, it is only by mathematical computation that one can deduce that the total includes the two items; but beyond that, the finding upon which appellant bases this argument is in the portion of the findings referring to the book account, and with respect to the book account it was unimportant whether the credits allowable to appellant are payments or offsets. In the specific finding on the subject of the open, mutual and current account, the court states that the total is diminished (as distinguished from "paid") by the following amounts:

"Desk ...............................$ 343.20
Blue Cross ......................... 453.70
Payments on account:           [in columnar form]

Total ...........................$29,421.30"

If there is any conflict in findings, we must reconcile the conflict, if possible, and give to them a meaning consistent with the judgment. (*Denbo* v. *Senness*, 120 Cal.App.2d 863, 868 [262 P.2d 31].)

Finally, it is argued by appellant that the evidence shows, as a matter of law, that the two items were paid for by respondent and that, therefore, they did not constitute part of a running account. (1) As to the desk, respondent's testimony was as follows: ". . . they kept the desk themselves but they wanted to charge me for it so I says, 'Okay, what is the amount?' And they said $343.20 and I says, 'All right, I buy it.' Q. And what is the—— THE COURT: Wait a minute. This was not a cash transaction? THE WITNESS: It was a deduction from the amount that they owed me." Appellant contends that this testimony shows an agreement of immediate payment. We do not agree that it does so, necessarily. The testimony is subject to the construction that the deduction was in the nature of an offset which was to be honored when a final reckoning would be made, and we assume that the court so decided. (2) Testimony as to the Blue Cross is as follows: "Q. And would you explain that item, please? A. Well, that is an arrangement we had with Blue Cross. I was supposed to pay them for the Blue Cross. They had Blue Cross for me and I paid them for it. THE COURT: They paid the Blue Cross for you? THE WITNESS: They paid the Blue Cross but I in turn paid them for it. It is a deduction from the amount they owed me—Blue Cross hospitalization." This, too, is susceptible of the inference that it was an offset, especially in view of the long period in which the parties had transactions without demands for settlement and without striking of any balance. The fact that the witness, a layman, used the word "paid" is not controlling . (3) It is contended by appellant that respondent's exhibit No. 5, which was offered by respondent in support of his alleged book account, shows that actual payments were considered by respondent to have been made for the desk and Blue Cross, because these two items appear on a sheet which also contains checks sent by appellant to respondent for commissions. This argument we find faulty, because (a) the folder is entitled "Amounts and Date of Money Advanced by Associated to

Me,'' and it will be noted that the word ''Advanced'' was used rather than ''Paid''; (b) the sheet itself is entitled ''Total Deductions from Symon'' (an accountant), not ''Total Payments''; (c) this folder and its enclosed sheet were vigorously attacked by appellant on the ground that the items were not made contemporaneously with the transactions but were made at the conclusion of all of them, and this item of evidence together with all others offered by respondent in support of the book account, was assailed by appellant on the ground that balances were not readily ascertainable as the transactions progressed. These very arguments, which have given us pause in the matter of the book account, tend to support the proposition that the desk and Blue Cross items were part of a running account.

The case is distinguishable from the cases of *Rocca* v. *Klein, supra,* 74 Cal. 526, *Carter* v. *Canty, supra,* 181 Cal. 749, and *Santa Rosa National Bank* v. *Barnett,* 125 Cal. 407 [58 P. 85], wherein periodic balances were struck on the account.

It is true that the two offsetting items are small in comparison with the total, but the evidence is quite sufficient to support the trial court's conclusion that an open, mutual and current account existed, particularly in the light of the conduct and relationship of the parties. We are the less inclined to disturb that conclusion because there is no suggestion by appellant that the debt for the outside commissions, as found by the court, was not owing, save for the statute of limitations. In view of our holding, it is unnecessary to discuss the intricate matter of the alleged book account or the claimed waiver of the statute of limitations.

Judgment affirmed.

Draper, P. J., and Salsman, J., concurred.

A petition for a rehearing was denied September 10, 1963, and appellants' petition for a hearing by the Supreme Court was denied October 9, 1963.